Docket No. 86049–Agenda 3–May 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM BRADLEY KIRCHNER, Appellant.

Opinion filed December 1, 2000.

JUSTICE McMORROW delivered the opinion of the court:

During the early morning hours of August 8, 1997, Charles Brewer, his wife, Doris Jean Brewer, and their daughter Bonnie Brewer were fatally stabbed at their home in rural Douglas County. A jury found defendant, William Bradley Kirchner, guilty of the first degree murders of the three Brewers. The same jury determined that defendant was eligible for the death penalty. After hearing evidence in aggravation and mitigation, the jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court of Macon County sentenced defendant to death. Defendant’s death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm defendant’s convictions and sentence.

BACKGROUND

In August 1997, Charles and Doris Jean Brewer lived in a house outside the small towns of Garrett and Atwood, approximately 28 miles east of Decatur. On August 8, 1997, a postal worker found Charles Brewer’s body outside of the Brewers’ house.

When the police responded to the postal worker’s 911 call, they observed a trail of blood leading from the front yard of the house, across the driveway, and around the side of the house, where Charles Brewer lay. Mr. Brewer had a fatal stab wound to the front of his neck. Police also found a cigarette butt with defendant’s DNA on it in the front yard.

There were no signs of forced entry to the Brewer house. Inside the front door, in the living room of the house, was Mrs. Brewer’s body. Mrs. Brewer had 16 stab wounds to her face, head, and neck. Under one of these wounds, her skull had been fractured. Like her husband, Mrs. Brewer was in her sixties and had mobility problems.

Bonnie Brewer’s body was found in the bathroom of the Brewers’ house. Bonnie, who was in her late thirties, had been staying with her parents while recuperating from jaw surgery. She had been stabbed or cut 20 times and had wounds to her face, neck, head, legs, arms, and hands. The tip of a knife was found embedded in her skull. There were black scuff marks on the floor of the bathroom.

Mr. Brewer’s wallet was found in the bathroom, and Mrs. Brewer’s and Bonnie’s purses were in the kitchen. Mr. Brewer had cashed a check for $100 on August 7, but there was no money in the wallet, purses, or anywhere else in the house. Also missing from the house was a beige table top telephone the Brewers kept in the living room. Police learned that three calls had been made from the Brewer house shortly after 3 a.m. on August 8.

There were only a few fingerprints on surfaces in the Brewer house. The State’s fingerprint expert testified that none of these fingerprints matched fingerprint samples from the three Brewers, defendant, or his friends Dyno Warner, Randy Merriman, and Chris Brown.

Several witnesses testified that, at the time of the Brewer murders, defendant was looking for money to pay a drug dealer to whom defendant owed money. Defendant had purchased crack cocaine three times from this dealer in Decatur on August 7, 1997. The first two times, defendant paid for the drugs. The third time, however, defendant bought about three grams of crack cocaine and did not pay the dealer. Around 10 p.m., the drug dealer followed defendant and his friend Randy Merriman to a house in Atwood, where defendant had indicated that he could obtain the money he owed. Defendant was driving his girlfriend Vicki Cox’s blue 1990 Oldsmobile. The dealer waited outside the house with Merriman for some time, but did not see defendant exit the house and eventually returned to Decatur. Before the dealer left, he told Merriman to tell defendant to “have [his] money or [he would] kick his tail.”

Defendant left the house in Atwood without being seen by the drug dealer or Merriman and drove with Jeff Peeler and Chris Brown to their friend Dyno Warner’s house in Garrett. Warner testified that they all smoked crack cocaine at his house and that defendant used a knife Warner owned to cut the cocaine. Warner further testified that defendant said he owed some money to someone waiting in Atwood and asked Warner if he knew of anyone who would buy some drugs. Warner replied that he knew a girl who might want to buy drugs. Warner testified that defendant paced back and forth, mentioned his need for money several times, and said he would do whatever was necessary to get money. Warner further testified that defendant asked him if he had any handguns “for money,” but Warner refused to give him a handgun.

According to Warner’s testimony, defendant then left his house with Peeler and Brown. Defendant returned to Warner’s house with Merriman around midnight. Defendant again “said that he needed money and he would do anything it took to get it,” and asked Warner if he knew anyone who would buy drugs. Warner said that he knew someone who might be interested in buying drugs. Defendant, Warner, and Merriman drove to the gas station where this person worked, but they did not obtain any money from her.

Warner stated that, after they returned to his house, defendant paced for a while and then exited the house, saying he would be back. Warner and Merriman watched television. Twenty minutes after defendant left, Warner noticed that his knife, the one defendant had used to cut cocaine, was missing from the place where Warner had hidden it under a pillow on the living room couch. Warner hid the knife from defendant after he observed defendant put the knife in his pants.

Warner further testified that, after an hour, defendant returned to Warner’s house and asked Warner to go to the back door. Warner estimated that defendant returned at about 1:30 a.m. or 2 a.m., but he was not sure of the time. Outside, the lighting was poor, but Warner saw spots on defendant’s shirt. Defendant asked Warner for a garden hose and towel and used water from the hose to rinse his head and face. He vomited, swore, and yelled, “What have I done.” Defendant was frantic and asked Warner for a pair of shorts. Warner gave defendant a pair of his shorts and asked defendant if he wanted any shoes, but defendant declined the offer. Defendant removed the blue jeans, T-shirt, and black boots he was wearing and threw them into a fire that was burning in a pit in Warner’s backyard. Before burning his jeans, defendant transferred a roll of money from the jeans to the shorts.

Warner then asked defendant for his knife, and defendant gave it to him. According to Warner, there were maroon spots on the sheath, there was blood all over the knife, and there was a white hair on the knife. In addition, the tip was missing from the knife. The tip was not missing when defendant had used the knife to cut cocaine on August 7. Defendant told Warner that he had stabbed a dog. After defendant changed clothes, he and Merriman drove to Decatur.

Warner admitted that, during the evening of August 8, he threw the knife into the Kaskaskia River because he knew it had been used in a crime and did not want “anything to come back” to him. Warner stated at trial that he had been charged with obstruction of justice but that he had been given no promises with respect to this charge in exchange for his testimony.

Merriman’s description of defendant’s activities was consistent with Warner’s. Merriman testified that defendant left Warner’s at about 3 a.m. on August 8. After about an hour, Merriman heard a car, and Warner went outside. Twenty to 30 minutes later, Merriman followed Warner outside. He saw Cox’s car parked in front of Warner’s house. In the back of the house, defendant was rinsing his head with a garden hose. Defendant told Merriman to stay by the car because he had been sick. Later, Merriman saw defendant and Warner talking next to a fire in the backyard. Defendant was wearing shorts and a T-shirt instead of the jeans, T-shirt, and work boots he had worn before leaving Warner’s house.

Merriman further testified that, after defendant changed his clothes, he and defendant drove to Decatur in Cox’s car. Merriman fell asleep in the car but awakened to see defendant throwing a beige table top telephone into Lake Decatur. When Merriman and defendant arrived in Decatur, defendant bought alcohol and cocaine, which he and defendant smoked.

Merriman also described events that occurred near the time of defendant’s arrest on August 15. Merriman testified that on August 14, he and defendant learned that Warner had been arrested. According to Merriman, defendant stated that he would have to “do” Warner because defendant did not know if Warner would “talk.” Merriman admitted that he did not tell police of defendant’s statement that he would have to “do” Warner until the week before trial.

William Hayes testified that, around 6 a.m. on August 8, he saw defendant and Merriman at a friend’s house in Decatur. Defendant asked Hayes where to buy some crack cocaine, and Hayes observed defendant buy drugs and alcohol. Defendant smoked crack cocaine at Hayes’ apartment and stole Hayes’ sandals.

Cox testified that she lived with defendant in August 1997. During the evening of August 7, defendant took her car. According to Cox, defendant did not return home the night of August 7 or the next morning. Merriman returned her car at about 7 a.m. in the morning of August 8, but Cox did not see defendant until the afternoon of August 8. Defendant told her that he had stayed at the house of some friends. When Cox saw defendant on August 7, defendant was wearing steel-toed black boots and jeans. On August 8, he was wearing a pair of denim shorts and sandals.

Cox testified that, on August 14, defendant gave her a notebook containing the following note:

“Vicki, baby, listen. You know I love you with all my heart. Some shit has happened concerning what I told you about. If a cop comes past, we have been fighting, and I left for a few days. I will have someone call tomorrow and tell you where to come. Take Saturday off work. We are camping. This will all be over in a few days. Please do as the letter says, okay, baby? I’ll explain. Don’t tell lawyer dick nothing. Bring the dog. Bring clothes, coats, my [C]at boots, and all the money. Bring hamburger and pork and beans. I love you. Brad. Bring this notepad with this letter.”

Cox gave the notebook to police, who found defendant’s prints on it.

Jeff Peeler testified that he smoked crack cocaine with defendant at Warner’s house on August 7. According to Peeler, when Warner said that he knew someone who might be interested in buying drugs, defendant said, “Well if she don’t want to buy none, we’ll just rob her and kill her.” Peeler also testified that, on August 9, defendant asked Peeler for money because, he said, he owed money for drugs. Defendant also asked Peeler if he had any knives for defendant to “go rob somebody.” Peeler said that he had no knives.

With respect to the circumstances of defendant’s arrest, Peeler testified that, during the evening of August 14, he and his wife drove defendant and Merriman from Atwood to Decatur to buy drugs. At defendant’s request, defendant and Merriman rode in the trunk of the Peelers’ car until they had traveled outside of Atwood. On their return from Decatur, the Peelers stopped outside of Atwood to comply with defendant’s request that defendant and Merriman reenter the trunk for the trip through Atwood.

The next morning, defendant and Merriman accompanied the Peelers and their children to Tuscola. The Peelers notified police that defendant was in their car, and police stopped the car. Defendant was hiding in the back seat of the car with a knife, but police arrested defendant apparently without incident.

Police interviewed defendant after his arrest. In a tape-recorded statement, defendant admitted that he had been in Atwood between 4:30 and 8 p.m. on August 7 but denied that he was in Garrett on August 7 or 8. Defendant stated that he had put Cox’s daughter to bed around 8:30 or 9 p.m. on August 7 and that he had spent the entire night with Cox.

On August 14, 1997, Warner showed police where he had dropped his knife into the Kaskaskia River. Police recovered the knife a few feet from this location on August 15. According to the State’s experts at trial, the metal fragment embedded in Bonnie Brewer’s skull matched the knife from the river, and there was human blood on the knife. In addition, the physician who performed the autopsies of the Brewers testified that all of their wounds could have been made with this knife.

On August 20, 1997, Merriman showed police where defendant had thrown the telephone into Lake Decatur. Police recovered the telephone near that location the next day. One of the Brewers’ daughters testified that this telephone looked like the one her parents kept in their living room.

Police searched the house defendant shared with Cox. In the basement was the pair of Warner’s shorts that defendant had borrowed, as well as the sandals he had stolen from Hayes. When police searched Warner’s house, they found a garden hose and a fire pit in the backyard. In the remains of the fire pit, there was a towel and two steel toe pieces. The State presented evidence that the size of the steel toe pieces was consistent with defendant’s shoe size. In addition, defendant’s supervisor at the Macon County Landfill, where defendant worked from December 1996 to May 1997, testified that defendant wore black “engineer” boots with a black sole.

Police also searched Warner’s car and Cox’s car. They found no evidence in Warner’s car. In Cox’s car, however, they found spots of blood on the dashboard. DNA analysis revealed that some of the blood on the dashboard belonged to defendant. Other blood on the dashboard was a mixture that included Bonnie Brewer’s blood. In addition, in the glove compartment, there was the front page of the Decatur Herald and Review from August 9, 1997. The front page contained a story about the Brewer murders, and a star was written under the headline. Defendant’s fingerprint was found on this newspaper.

The defense presented only two witnesses at trial. A police officer testified that Warner had said that he, not defendant, had thrown the clothes into the fire pit. A forensic scientist from an Illinois State Police laboratory testified that, among the hairs found on Bonnie Brewer’s shirt, there was one hair that did not match the hair samples from defendant, Warner, Bonnie Brewer, Charles Brewer, or Doris Jean Brewer. Also, among the hairs found on the towel from the fire pit, there was one hair that did not match the hair samples from defendant, Warner, Bonnie Brewer, Charles Brewer, or Doris Jean Brewer. The forensic scientist testified that he was not given a hair sample from Merriman.

Following the presentation of this evidence, the jury found defendant guilty of the first degree murders of Charles Brewer, Doris Jean Brewer, and Bonnie Brewer. After a hearing, the same jury found defendant eligible for the death penalty under sections 9–1(b)(3), (b)(6), and (b)(11) of the Criminal Code of 1961 (720 ILCS 5/9–1(b)(3), (b)(6), (b)(11) (West 1996)).

At the aggravation-mitigation stage of sentencing, the State presented victim impact statements from the Brewers’ relatives and certified copies of defendant’s previous convictions. In 1989, he was convicted of the unlawful use of weapons. In 1992, he was convicted of disorderly conduct, burglary, intimidation, and battery. In 1993, he was convicted of residential burglary and theft.

A deputy sheriff testified that defendant’s disorderly conduct convictions stemmed from bomb threats he had made to a local elementary school and a local high school. Defendant’s burglary convictions resulted from his burglary of the same local high school and a service station. The deputy sheriff further testified that defendant was convicted of intimidation and battery based on his former girlfriend’s complaint that he had beaten her, held her against her will, and said that if she pressed charges against him, he would not kill her but would hit her and watch her bleed.

According to the deputy sheriff, defendant’s residential burglary and theft convictions were based on his entry into the Lust family residence, which was in Piatt County eight miles from the Brewer house. Like the Brewer house, it was outside of town and surrounded by farm fields. In addition, a cigarette butt was found outside the house, there were no signs of forced entry, and no fingerprints were found inside the house. When police interviewed defendant in the course of investigating this crime, defendant admitted that he had parked his car in the driveway of the house, his codefendant knocked on the front door, and, when there was no answer, defendant entered through an unlocked door. Defendant explained that no fingerprints were found in the Lust residence because he and his codefendant had worn gloves. Defendant took money and three handguns from the residence. His codefendant kept one of the guns, and defendant said that he threw two of the guns into the Kaskaskia River. Police recovered no guns from the river but, in 1996, one of the guns defendant said he had thrown in the Kaskaskia River was recovered by police in Chicago.

The State also presented evidence concerning defendant’s behavior in jail while awaiting trial in this case. According to this evidence, in February 1998, defendant threatened to “blacken” the eyes of a jail inspector.

In mitigation, one of defendant’s cousins testified that defendant was small and shy in school, and other children would tease him. He was tested for a learning disability. He was involved in BMX bicycle racing, had played Little League baseball until he was knocked unconscious by a baseball, and had played football in high school. The death of defendant’s infant brother when defendant was eight or nine years old was very hard on defendant. Defendant was very close to his cousin’s 12-year-old daughter and supported his cousin during her divorce. He was very artistic and drew pictures for the children of friends and relatives. In addition, defendant had a Christian background and changed his nickname from Patches to Pages after “receiv[ing] God.” Another of defendant’s cousins also testified that her daughter was close to defendant and that defendant had learning difficulties. A relative of Vicki Cox testified that defendant was good with Cox’s daughter and that the child called defendant “Dad.”

One of defendant’s high school teachers testified that defendant was below-average academically, but he had made a unique cake decorated like a Jeep in the home economics class she taught. Defendant’s probation officer testified that he had had no problems with defendant, and defendant had successfully completed probation for his unlawful use of weapons conviction. The probation officer also testified that defendant’s father and grandfather were members of the Veterans of Foreign Wars, and defendant had helped with fundraisers for this organization. Defendant’s supervisor at the Macon County Landfill testified that defendant was a good worker, whom the supervisor recommended be hired full-time. Defendant did not return to work, however, after May 1997. His girlfriend said that defendant had hurt his hand, and the supervisor had heard that defendant had been in a knife fight.

In addition, several individuals who had contact with defendant in prison during the early nineties testified on his behalf. A correctional officer testified that he supervised defendant on a work crew. According to this officer, defendant was a good worker, related well to the other inmates and did not cause problems. The officer had given defendant a good recommendation so that defendant could transfer to a different Illinois Department of Corrections facility. A counselor testified that defendant performed charity work while in prison in conjunction with a veterans group. The counselor described him as “one of the very easy people to deal with,” who related well to the other inmates.

Other individuals testified concerning defendant’s behavior in prison while awaiting trial for the Brewer murders. The pastor of a church defendant had attended with his parents testified that he visited defendant in prison six times after 1997, and defendant was receptive to his visits. According to this pastor, defendant continued to be distraught over the death of his little brother. A prison chaplain testified that defendant participated in Bible study through correspondence. Correctional officers testified that they had no problems with defendant and that defendant had given other inmates soap, shampoo, and cigarettes.

Dr. Jonathan Hess, a neuropsychologist, testified that defendant had suffered one or more traumatic brain injuries. Dr. Hess’ evaluation of defendant indicated that defendant had damage to the frontal lobes of his brain and that this damage was more to the left than the right side of the brain For example, defendant had a very modest verbal IQ, was poor in solving sequential thinking problems, and had attention and retention problems. According to Dr. Hess, the damage to defendant’s brain could have been caused by being hit in the head with a ball, by falling off of a bike, or by playing football.

Dr. Hess explained that among the effects of defendant’s brain damage were an inability to control anger, irritability, a volatile disposition, a quick temper, a susceptibility to rage upon provocation, a failure to estimate the consequences of actions, and impulsivity. Dr. Hess further testified that these problems could be treated with medication.

After hearing this evidence, the jury found no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court sentenced defendant to death.

ANALYSIS

I. Voir Dire

A. 
Juror Rentfro

Defendant first argues that resentencing is required because the circuit court erred in excluding prospective juror James Rentfro for cause. During 
voir dire
, Rentfro responded to the circuit court’s questions as follows:

“THE COURT: Do you have any religious or moral beliefs that would prevent you from serving in this type of criminal case?

JUROR RENTFRO: I don’t believe in the death penalty, let’s put it that way.

THE COURT: In other words, are you basically saying under no circumstances could you impose the death penalty?

JUROR RENTFRO: No.

THE COURT: Then I will excuse you for cause. You may step down.”

Subsequently, defense counsel requested a side bar, after which defense counsel was permitted to question the prospective juror. The following colloquy occurred:

“[Defense counsel]: Mr. Rentfro, I am just going to ask you some questions in regard to the last answer you gave.

JUROR RENTFRO: Okay.

[Defense counsel]: Do you understand that we are a society of laws?

JUROR RENTFRO: Yes, sir.

[Defense counsel]: And do you also understand the duty of citizens to follow the law even if they don’t agree with it?

JUROR RENTFRO: Correct.

[Defense counsel]: If you are selected as a juror in this case, Mr. Rentfro, the Judge will instruct you and your fellow jurors as to the law in this case and that you must set aside your personal opinions and follow the law. You would be able to listen to the Judge and follow the law as he told you that the law applies to the case?

[State]: I object to leading.

THE COURT: Sustained as to the form of the question.

[Defense counsel]: Would you be able to follow the law as the Judge instructs you and your fellow jurors?

JUROR RENTFRO: Yes.

[Defense counsel]: So then, in spite of your personal feelings regarding the death penalty, would you be able to fill your duty as a citizen to fairly, without prejudice, weigh the evidence in this case and follow the law in the trial, and if there is a sentencing, in the sentencing also?

JUROR RENTFRO: Yes. To follow the instructions, yes.

[Defense counsel]: Thank you, Your Honor.

THE COURT: That gets me back to the original question. Does your original answer still stand?

JUROR RENTFRO: Yes, sir.

THE COURT: Then I will excuse you for cause.”

Defendant argues that the circuit court should not have excused Rentfro for cause because, viewed in their entirety, his responses indicated only a “general disbelief in the death penalty rather than an unambiguous statement that he would automatically vote against the death penalty.” According to defendant, it was a violation of 
Witherspoon v. Illinois
, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), to excuse Rentfro for cause because he did not unambiguously state that he would automatically vote against the death penalty. Defendant asserts that this error requires a new sentencing hearing.

Under 
Witherspoon v. Illinois
, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), and its progeny, prospective jurors who express only general objections to the death penalty may not be excluded for cause. 
People v. Gilliam
, 172 Ill. 2d 484, 509-10 (1996). Removal for cause is proper only if “ ‘the juror’s views would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ ” 
People v. Shaw
, 186 Ill. 2d 301, 316 (1998), quoting 
Wainwright v. Witt
, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852 (1985), quoting 
Adams v. Texas
, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980). Jurors who would not vote for the death penalty in any case are not impartial jurors and may be removed for cause. 
People v. Jackson
, 182 Ill. 2d 30, 58 (1998), citing 
Morgan v. Illinois
, 504 U.S. 719, 726-34, 119 L. Ed. 2d 492, 500-06, 112 S. Ct. 2222, 2228-32 (1992).

In determining whether a prospective juror should be excused for cause, the circuit court “need not follow a set formula in posing questions on 
voir dire.
” 
People v. Cole
, 172 Ill. 2d 85, 99 (1996). A potential juror’s remarks must be considered as a whole (
People v. Taylor
, 166 Ill. 2d 414, 423-24 (1995)), and the circuit court may properly remove a prospective juror for cause even if the individual does not express his or her views with “meticulous preciseness” (
People v. Rissley
, 165 Ill. 2d 364, 402 (1995)). However, it must be clear that a prospective juror is willing to “set aside his or her own beliefs in favor of the rule of law.”
 Taylor
, 166 Ill. 2d at 424; see also 
People v. Williams
, 161 Ill. 2d 1, 54 (1994); 
People v. Pitsonbarger
, 142 Ill. 2d 353, 386 (1990), citing 
Lockhart v. McCree
, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766 (1986). Whether to excuse a juror for cause is within the sound discretion of the circuit court, which is in a “ ‘superior position to determine not only from a venireperson’s responses as a whole but also from a venireperson’s demeanor whether that person’s views toward capital punishment would substantially prevent or impair the venireperson’s performance of his or her duties as a juror in accord with the oath a juror is required to take.’ ” 
Shaw
, 186 Ill. 2d at 318, quoting
 Taylor
, 166 Ill. 2d at 424.

After reviewing Rentfro’s responses, we hold that the circuit court did not err in excluding Rentfro for cause because of his opposition to the death penalty. Rentfro initially stated that he did not believe in the death penalty. Subsequently, he answered “no” to the circuit court’s question, “In other words, are you basically saying under no circumstances could you impose the death penalty?” Because of the manner in which the circuit court phrased this question, we cannot determine from the cold record whether, by answering “no,” Rentfro meant, “I am not saying that under no circumstances I could impose the death penalty,” or whether he meant, “Under no circumstances could I impose the death penalty.” Immediately after Rentfro answered this question in the negative, however, the circuit court stated that Rentfro would be excused for cause. It is clear, therefore, that the circuit court interpreted Rentfro’s answer to mean that he would not impose the death penalty under any circumstances. The circuit court was in a superior position to ascertain the meaning of Rentfro’s responses, and deference to the circuit court’s judgment is appropriate in these circumstances. See, 
e.g.
, 
Williams
, 161 Ill. 2d at 52-56.

Contrary to defendant’s argument, Rentfro’s responses to defense counsel’s subsequent questions do not indicate that he could set aside his personal views against the death penalty and vote in favor of the death penalty if the law required it. Defense counsel asked Rentfro, generally, whether he could follow the law and whether he could set aside his personal beliefs regarding the death penalty and follow the law. Rentfro responded that he could. We agree with the State, however, that it is significant that defense counsel did not explain to Rentfro that the law may require the imposition of the death penalty under certain circumstances. In light of this omission, Rentfro’s responses to defense counsel’s inquiry do not demonstrate that he could vote in favor of the death penalty in spite of his personal opposition to it. Indeed, following defense counsel’s inquiry, Rentfro reiterated that he could not impose the death penalty in any circumstances by reaffirming his negative answer to the circuit court’s earlier question. We decline to overturn the circuit court’s determination that prospective juror Rentfro’s views on the death penalty would substantially interfere with his ability to serve as an impartial juror.

B. 
Newspaper Article in Jury Assembly Room

Defendant argues that he was denied due process of law and his right to trial by an impartial jury when jurors were exposed to a prejudicial newspaper article on May 18, 1998, the first day of jury selection. Prior to 
voir dire
, defendant requested that prospective jurors be questioned individually outside the presence of other venirepersons. The circuit court denied this request and decided instead that, in the interest of time, jurors would be questioned in panels of four. During the examination of the second panel of four jurors, a prospective juror revealed that he had read about defendant’s case in a newspaper that was in the jury assembly room, where prospective jurors waited to be called for 
voir dire
.

The circuit court had the newspaper removed from the jury assembly room, and defendant moved for a mistrial. Defense counsel stated that he had seen two or three copies of the May 18, 1998, issue of the Decatur Herald & Review in the jury assembly room. According to defense counsel, the jury pool was tainted by its exposure to an article on the front page of this issue.

That article had the headline, “Jury selection begins in triple slaying,” and a picture of defendant in handcuffs and an orange jumpsuit. The article described, 
inter alia
, the “general feeling of unease” and fears of Douglas County residents as a result of the murders, the victims’ employment histories and their good characters, the victims’ survivors, the impact of the murders on Bonnie Brewer’s coworkers, defendant’s criminal record, and the State’s assertion at a bond hearing that defendant had a “ ‘great motivation’ ” to flee. The article also contained information Warner had given police, such as the fact that defendant had come to Warner’s house with blood on his clothing and a bloody knife with a broken tip. The circuit court denied the motion for a mistrial but stated that it would ask, and permit counsel for both sides to ask, prospective jurors whether they had read or heard anything about the case that would prevent them from being impartial. After defendant’s motion for mistrial was denied, defense counsel made a continuing objection based on the newspaper article.

Before and after the defense motion for a mistrial, the circuit court’s questioning of jurors about pretrial publicity was essentially the same. The circuit court asked prospective jurors whether “Without saying what [they] might have read or might have heard, [had they] read or heard anything about this case before today.” If jurors responded affirmatively to this question, the circuit court asked them whether they could be impartial, despite what they had read or heard about the case. The circuit court asked some jurors when they had read or heard about the case but did not ask the jurors specifically what they had learned about the case from pretrial publicity.

Defense counsel and the State also questioned prospective jurors about their exposure to publicity about the case. Like the circuit court, neither defense counsel nor the State asked prospective jurors to give details of what they had read or heard about the case. Instead, both before and after defendant’s motion for mistrial, the inquiry focused on the timing of the exposure and the jurors’ ability to base their decision only on evidence presented at trial.

The circuit court removed jurors who stated that they thought they could not be impartial based on their outside knowledge of the case. It did not remove jurors who stated that they had read or heard about the case but that they could nevertheless be impartial. Defense counsel used only 5 of defendant’s 14 initial peremptory challenges and none of his three additional peremptory challenges available for alternate jurors.

Two of the 12 jurors ultimately selected to serve on defendant’s jury stated that they had not read or heard anything about the case. Only one of the jurors selected indicated that she had seen the Herald & Review in the jury assembly room. Juror Nunn stated that she saw the headlines about defendant’s case in a newspaper that someone had in the jury assembly room and had read the first paragraph of an article. She asserted, however, that what she had read would not affect her ability to be impartial. In addition, she said that she understood that information in the media was not evidence and that the only evidence she could consider was that presented in the courtroom. She also stated that she could keep the newspaper reports out of her mind while deliberating.

Three other jurors, juror Althoff, juror Snapp, and juror Mowery, said that they had seen an article about defendant’s case in the newspaper on May 18, but did not indicate which newspaper or where they had seen the newspaper. Juror Althoff testified that he had merely glanced at the article and did not form any opinions about the case. Juror Snapp testified that she had skimmed the article but did not remember much of it. All three of these jurors stated that what they had read would not affect their ability to be impartial and that they would consider only evidence presented in court. Juror Snapp further testified that she could keep information from the newspaper out of her mind during deliberations.

Juror Smith testified that he had not read anything about the case, but his mother had asked him if he had read the May 18 newspaper and had told him that the jury was being selected in defendant’s case. According to Smith, he did not know what his mother was talking about because he does not read the paper. He asserted that the information he had learned from his mother would not prejudice him in defendant’s case, he understood that facts in newspaper reports are not evidence, and he could keep these facts out of his mind in deciding the case.

Three other jurors, juror Blankenship, juror Jones, and juror Bailey, read about defendant’s case at the time the Brewer murders occurred but did not read or hear about the case near the time of trial. Juror Jones stated that, although she had read about the case, she did not know much about the murders and did not form an opinion about the case. All three of these jurors said that they could be impartial despite what they had learned about the case outside of court, they understood that information presented in the media was not evidence, and they would decide the case based only on matters presented in court.

With respect to the two remaining jurors, juror Bean stated that she had not read or heard “ much” about the case and that this information would not cause her to be biased against either side. In addition, she stated that she could put aside what she had learned outside of court. Juror Muth stated that she had read or heard about the case when it happened and around the time of trial but that she could nevertheless be impartial. She had developed an opinion that “it was very terrible.” However, when asked whether she would put what she had heard aside and listen to the evidence, she replied, “I would certainly try to, yes.”

Defendant now asserts that he was denied due process of law and his right to a trial by an impartial jury when jurors saw the Herald & Review article on the morning that jury selection began. In particular, defendant claims prejudice based on the newspaper picture of him in handcuffs, and the information in the article concerning his prior convictions, the victims’ positive attributes, the impact of Bonnie’s death on her coworkers, the fears of Douglas County residents, and defendant’s motivation to escape. According to defendant, jurors’ assertions that they could be impartial cannot be believed due to the inflammatory nature of this publicity.

In addition, defendant contends that the transfer of the case from Douglas County to neighboring Macon County was inadequate to reduce the prejudicial effect of publicity, and the circuit court should have delayed jury selection until jurors who had not seen the May 18 article could be found. Defendant asserts that only 10 of the 44 prospective jurors examined stated that they had not read newspaper stories about the case. Defendant argues that he must be granted a new trial by a jury not prejudiced by inflammatory publicity. In the alternative, he requests a new sentencing hearing.

Under both the United States and the Illinois Constitutions, a criminal defendant is entitled to a jury that is impartial, which means “ ‘a jury capable and willing to decide the case solely on the evidence before it.’ ” 
People v. Olinger
, 176 Ill. 2d 326, 353 (1997), quoting 
Smith v. Phillips
, 455 U.S. 209, 217, 71 L. Ed. 2d 78, 86, 102 S. Ct. 940, 946 (1982). Exposure to publicity about a case is not enough to demonstrate prejudice because jurors need not be totally ignorant of the facts and issues involved in a case. 
People v. Sutherland
, 155 Ill. 2d 1, 15-16 (1992), citing 
Irvin v. Dowd
, 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961). This court has previously recognized that “[c]rimes, especially heinous crimes, are of great public interest and are extensively reported. It is unreasonable to expect that individuals of average intelligence and at least average interest in their community would not have heard of any of the cases which they are called upon to judge in court.” 
People v. Taylor
, 101 Ill. 2d 377, 386 (1984). A juror must, however, be capable of disregarding his or her impressions or opinions and decide the case based solely upon the evidence presented in court. 
People v. Coleman
, 168 Ill. 2d 509, 547 (1995). In evaluating a defendant’s claim that his jury was prejudiced due to pretrial publicity, a reviewing court must review the entire record, including 
voir dire
 testimony, to determine independently whether the defendant was denied a fair trial.
 People v. Sanchez
, 115 Ill. 2d 238, 263 (1986).

In an analogous case, 
People v. Sutherland
, 155 Ill. 2d 1 (1992), this court rejected a defendant’s claim that he was denied a fair trial by extensive media coverage in his case. In 
Sutherland
, as in the instant case, a change of venue was granted to a nearby county. The defendant argued that transferring the case only 75 miles from the scene of the murder was essentially no change of venue. The defendant asserted that media coverage of the case affected residents of the county where the case was tried in the same way that it had affected residents in the county where the murder occurred. The defendant observed that 92% of the veniremen stated that they had read or heard about the case, and 34% of that group stated that they believed the defendant was guilty and that they could not put aside this opinion. 
Sutherland
, 155 Ill. 2d at 15.

This court refused, however, to grant the defendant a new trial in 
Sutherland
 based on pretrial publicity. It noted that the 12 jurors selected for the case stated that they had not formed an opinion based on what they had read or heard and that they could decide the case based only on evidence presented in court. In addition, this court rejected the defendant’s argument that “a juror’s good faith cannot counter the effect of exposure to prejudicial extrajudicial pretrial information.” 
Sutherland
, 155 Ill. 2d at 16. Although 10 of the 12 jurors had heard about the case, their awareness of the case was “general” and “minimal,” and came only from local papers. In addition, none remembered information prejudicial to defendant. Based on these facts, the 
Sutherland
 court concluded that the defense was able to select a fair and impartial jury, and the change in venue was sufficient to protect the defendant’s rights. 
Sutherland
, 155 Ill. 2d at 16.

As in 
Sutherland
, our review of the record in the case at bar leads to the conclusion that “the level of awareness of the case on the part of the venire and the jury ultimately selected was not so great as to establish partiality and to deny the defendant a fair trial” (
Sanchez
, 115 Ill. 2d at 263). Of the 12 jurors selected, 10 had read or heard about the case, and the record indicates that their knowledge was based only on newspaper reports. All of the 10 expressed a willingness to put aside what they knew of the case and decide it based only on the evidence presented in court. They also averred that they could be impartial despite what they had learned of the case outside the courtroom. More than half of the 10 who had read or heard of the case indicated that they had minimal familiarity with the case, having merely “skimmed” or “glanced” at newspaper reports. Furthermore, we note that defendant only used 5 of his 14 peremptory challenges, a factor that, while not conclusive, weighs against a finding of jury bias. As in 
Sutherland
, we find that pretrial publicity did not deny defendant a fair trial. See 
Sanchez
, 115 Ill. 2d at 264-65 (holding that defendant was not denied a fair trial as a result of pretrial publicity; coverage was extensive but typical for a case of its nature and not “unprecedented” in intensity).

Defendant asserts that the circuit court’s failure to ask jurors precisely what they had read and recalled about the case precludes a determination that his jury was impartial. He also claims that the circuit court’s failure to grant his request for individual 
voir dire
 prevented defense counsel from making such an inquiry. In 
Mu’Min v. Virginia
, 500 U.S. 415, 425, 114 L. Ed. 2d 493, 506, 111 S. Ct. 1899, 1905 (1991), however, the United States Supreme Court approved of 
voir dire
 conducted in the manner chosen by the circuit court in defendant’s case. In 
Mu’Min
, as in the instant case, the circuit court denied the defendant’s request for individual 
voir dire
 and instead examined jurors in panels of four. See 
Mu’Min
, 500 U.S. at 419, 114 L. Ed. 2d at 501-02, 111 S. Ct. at 1902. In addition, in 
Mu’Min
, the circuit court refused to ask jurors questions about the content of pretrial publicity to which they were exposed. Instead, the court asked jurors whether the information they had learned outside of court would affect their abilities to be impartial.

The Supreme Court approved of this procedure
. The Court explained: “Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he has not formed an opinion about the case?” 
Mu’Min
, 500 U.S. at 425, 114 L. Ed. 2d at 506, 111 S. Ct. at 1905-08. The Court held that questions about the content of publicity are not constitutionally required and that the 
voir dire
 conducted was sufficient to protect the defendant’s right to a fair trial by an impartial jury. 
Mu’Min
, 500 U.S. at 425-32, 114 L. Ed. 2d at 506-10, 111 S. Ct. at 1905-08; see also 
Coleman
, 168 Ill. 2d at 547-48. Based on this authority, we conclude in the case at bar that the circuit court was not required to ask jurors to detail their recollection of media coverage of defendant’s case. The 
voir dire
 in this case was sufficient to determine whether jurors could decide defendant’s case based on the evidence presented in court.

We also reject defendant’s argument that pretrial publicity was so pervasive and prejudicial that it created “ ‘such a presumption of prejudice in [the] community that the jurors’ claims that they can be impartial should not be believed’ ” (
Coleman
, 168 Ill. 2d at 548, quoting 
Patton v. Yount
, 467 U.S. 1025, 1031, 81 L. Ed. 2d 847, 854, 104 S. Ct. 2885, 2889 (1984)). In support of this contention, defendant relies on this court’s decision in 
People v. Taylor
, 101 Ill. 2d 377 (1984), in which this court granted a defendant a new trial on the basis that the jury was prejudiced by pretrial publicity. The 
Taylor
 court described the media coverage of the case in the county where the crime occurred and surrounding counties as “unprecedented.” Detailed coverage began on the day of the crime and continued through trial. There were daily reports on the radio and television, as well as extensive coverage in two local newspapers. Details about the crime and the defendant were provided by the media, as well as information that a codefendant had been released after “passing” a lie detector test, whereas the defendant “did not pass” and was not released 
Taylor
, 101 Ill. 2d at 383-84. A public opinion poll conducted by defense counsel indicated that 378 of 382 registered voters surveyed had heard of the case, and 72% believed police had arrested the right person. 
Taylor
, 101 Ill. 2d at 382-83.

This court held in 
Taylor
 that the circuit court erred in refusing to grant the defendant’s challenges for cause and motion for change of venue based on the pretrial publicity. Although jurors stated that they could set aside what they had read or heard about the case and base their verdict only on evidence in the courtroom, the 
Taylor
 court determined that these assertions were insufficient based on the extent and nature of the publicity about the case. The record indicated that at least three, and possibly six, jurors were aware of facts indicating that the defendant had performed poorly on a lie detector test. The 
Taylor
 court held that the defendant’s challenges for cause to five of these jurors were improperly denied, and the defendant had exhausted his peremptory challenges. The 
Taylor
 court concluded that, although the jurors may have been sincere in stating that they could disregard such outside knowledge of the case,

“[t]he concern is that this information about polygraphs, by its nature, is unlike other factual details. This is not the type of information which the average juror can easily ignore. Its effect is subtle and unconscious, but at the same time potent. Whether or not the juror is aware of it or can express his feelings accurately, exposure to this type of highly inflammatory material is enough to raise the presumption of partiality.” 
Taylor
, 101 Ill. 2d at 393.

In holding that the defendant was denied his right to a fair trial by the denial of his challenges for cause and his motion for change of venue, the 
Taylor
 court repeatedly emphasized the unique facts of the case. According to the 
Taylor
 court, its holding was not based merely on the sheer volume of publicity or the “bare potential for bias.” Rather, it was based on the documented “unprecedented volume of publicity” combined with the jurors’ exposure to the polygraph information, which was particularly persuasive and highly prejudicial. 
Taylor
, 101 Ill. 2d at 395.

We disagree with defendant that, under 
Taylor
, the jurors’ assertions in defendant’s case that they could be impartial despite what they had learned about the case outside the courtroom should be disregarded. The record contains no indication that this case received the “unprecedented” amount of coverage that existed in 
Taylor
. Evidence in the record of media coverage of defendant’s case is limited to the May 18, 1998, issue of the Decatur Herald & Review and several newspaper reports in August and September 1997.

While some of the information in these news reports was prejudicial to defendant and inadmissible, it was not of the peculiarly inflammatory nature of the polygraph results disclosed in 
Taylor
. The newspaper reports about defendant’s case generally described the circumstances of the murders and defendant’s arrest, the charges against defendant and Warner, Warner’s description of defendant’s actions on August 8, defendant’s criminal record, fears of Atwood and Garrett residents after the murders, the police investigation, and the victims’ lives before the murders. Unlike the polygraph details in 
Taylor
, press coverage of these facts in defendant’s case does not require a finding that defendant was denied a fair trial despite the juror’s assertions that they would decide his case based only on the evidence presented in court. For example, this court has stated that “[a] juror’s knowledge of the accused’s prior convictions for other offenses does not create a presumption of prejudice.” 
Coleman
, 168 Ill. 2d at 547, citing 
Murphy v. Florida
, 421 U.S. 794, 44 L. Ed. 2d 589, 95 S. Ct. 2031 (1975). In addition, “[b]ecause television and the media regularly depict criminal defendants in handcuffs, a juror’s viewing a defendant in handcuffs can no longer be regarded as having a shocking effect on a prospective juror’s sensibilities.”
 People v. O’Toole
, 226 Ill. App. 3d 974, 985 (1992). We hold that the circuit court did not err in denying defendant’s motion for a mistrial based on pretrial publicity. We also decline defendant’s request that we find that the circuit court abused its discretion by not delaying the trial so that the jury could be selected from a venire that did not see the article. There was no request for a continuance, and, as stated, defendant was not denied a fair trial by the jurors who were selected on May 18 and 19, 1998.

II. Trial

In addition to his challenges to 
voir dire
, defendant raises three issues with respect to the guilt-innocence phase of the proceedings in his case. Defendant does not challenge the sufficiency of the evidence to support his convictions. He claims, instead, that his convictions must be reversed because (1) the circuit court refused to order a psychiatric evaluation of Merriman; (2) the circuit court excluded evidence of Warner’s possession of the murder weapon several months before the Brewer murders; and (3) the circuit court refused to give an accomplice witness instruction to the jury.

A
. Psychiatric Evaluation of Merriman

Before trial, defendant requested that the circuit court order a psychological and psychiatric evaluation of Randy Merriman. In addition, defendant asked the court to require the State to disclose Merriman’s mental health treatment records. The circuit court denied defendant’s request for an examination of Merriman but ordered the State to submit records of Merriman’s mental health treatment for an 
in camera
 inspection by the court. After examining the records, the circuit court granted defense counsel’s request to use eight documents for purposes of impeaching Merriman’s testimony. At trial, Merriman testified on direct and cross-examination concerning his history of substance abuse, mental illness, and memory problems.

Defendant acknowledges that the jury was presented with information concerning Merriman’s mental health, but he contends that “a current psychiatric evaluation was needed to allow the defense to investigate and possibly present defense evidence to the jury as to how Merriman’s mental problems affected his credibility as a witness as well as his ability to perceive reality at the time of the crime.” According to defendant, Merriman’s credibility was critical to the State’s case against defendant, and the circuit court’s refusal to order an evaluation of Merriman deprived defendant of his right under the sixth amendment to the United States Constitution to confront witnesses and present a defense.

A criminal defendant’s right to confrontation under the sixth amendment includes the right to cross-examine witnesses against him. 
People v. Kliner
, 185 Ill. 2d 81, 130 (1998), citing
 Davis v. Alaska
, 415 U.S. 308, 315, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110 (1974). “Any permissible matter which affects the witness’s credibility may be developed on cross-examination.” 
Kliner
, 185 Ill. 2d at 130. However, “[a] defendant’s rights under the confrontation clause are not absolute. Rather, ‘the Confrontation Clause guarantees an 
opportunity
 for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.’ ” (Emphasis in original.) 
People v. Jones
, 156 Ill. 2d 225, 243-44 (1993), quoting 
Delaware v. Fensterer
, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294 (1985). The latitude allowed on cross-examination is within the sound discretion of the circuit court, and a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. 
People v. Frieberg
, 147 Ill. 2d 326, 357 (1992); 
People v. Sandoval
, 135 Ill. 2d 159, 194 (1990).

Because of the information made available to the defendant through Merriman’s mental health treatment records, we cannot conclude that the circuit court abused its discretion by denying defendant’s request for a psychological and psychiatric evaluation of Merriman. The defense received copies of records from June 1997 through March 1998. These records, which included psychiatric and mental health evaluations, indicated that Merriman had sought treatment for depression and substance abuse several times in 1997 and 1998. Records of evaluations on June 3, 1997, and July 30, 1997, showed that Merriman had been diagnosed with major depression with psychotic features. He had been prescribed Risperdal and Serzone in May 1997, which improved the symptoms of his depression. Also according to these records, Merriman said he had suicidal thoughts, described his thoughts as “jumbled up,” and stated that he had problems with his memory and concentration. In addition, he reported a history of cocaine dependence but stated that he had not used cocaine since April 1997.

In October 1997, Merriman told mental health workers that he had not used cocaine since April 1997. In December 1997, however, Merriman sought treatment for substance abuse. At that time, he admitted smoking $50 of crack cocaine a day and reported hallucinations of people hiding behind trees in front of his parents’ house. According to the December evaluation, Merriman’s use of drugs appeared to aggravate his psychiatric symptoms. Other mental health treatment records provided to the defense indicated that, following Merriman’s release from a drug rehabilitation program in 1998, he relapsed and entered drug treatment again in February 1998 after using $600 of crack cocaine on one day.

These records permitted the defense to conduct an effective cross-examination of Merriman. At trial, Merriman testified on direct examination that he was a drug addict and that he had been diagnosed with a severe major depressive disorder with psychotic features. He stated that he ingested medication for this mental illness on August 7. Merriman acknowledged that he sometimes had problems remembering things but asserted that he recalled the events of August 7, 8, 14, and 15 “pretty well.” On cross-examination, Merriman stated that he had been treated for cocaine addiction in 1997 and 1998 and sought mental health treatment in 1997 on several occasions. He admitted that, on July 30, he had complained of jumbled thought, bad memory, and hallucinations and had indicated that his cocaine addiction made his symptoms worse. He had been on medication since May 1997 and used crack cocaine on the morning of August 8.

 As this testimony demonstrates, the defendant was able to provide the jury with ample information from which to evaluate Merriman’s credibility and ability to perceive and recall the events surrounding the Brewer murders and defendant’s arrest. Accordingly, the circuit court’s refusal to order a psychological and psychiatric examination of Merriman was not an abuse of discretion resulting in manifest prejudice to defendant, and defendant was not denied his rights under the sixth amendment.

B
. Exclusion of Evidence of Warner’s Possession of the Murder Weapon

Defendant also argues that he must receive a new trial as a result of the circuit court’s exclusion of evidence that Dyno Warner possessed the knife used to kill the Brewers when he was stopped by police several weeks prior to the Brewer murders. The State filed a motion 
in limine
, in which it requested that the circuit court bar evidence relating to the June 20, 1997, police stop of Warner’s car. At the time, Warner was riding in the passenger seat of the car. During a search of the vehicle, police found the knife later used in the Brewer murders between the driver’s and passenger’s seats. Warner was not arrested or charged as a result of this stop, but another passenger in the car was arrested for possession of marijuana. The court granted the motion 
in limine
.

Defendant argues that evidence that Warner had the knife on June 20, 1997, was relevant and admissible because it “made it more probable that he was the one who used the knife to murder the Brewers ***, and that he was lying about Brad taking the knife.” In addition, defendant asserts that evidence that Warner had the knife in his car in June 1997 indicated that Warner used the knife to commit drug offenses instead of merely keeping it in his home. According to defendant, the exclusion of this evidence prevented him from asking Warner if, at the time of the murders, he was also using the knife to get drugs, and prevented defendant from relying on this evidence to support his theory that Warner and Merriman rather than defendant killed the Brewers. Defendant contends that he was thereby denied his rights under the sixth amendment to confront witnesses and to present a defense.

It is the function of the circuit court to determine the admissibility of evidence, and a reviewing court will not reverse the circuit court’s ruling on a motion 
in limine
 absent an abuse of discretion. 
People v. Williams
, 188 Ill. 2d 365, 369 (1999); 
People v. Buss
, 187 Ill. 2d 144, 219 (1999). In order to be admissible, evidence must be legally relevant, that is, it must tend “ ‘to make the existence of any fact in consequence to the determination of the action more or less probable than it would be without the evidence.’ ” 
People v. Hope
, 168 Ill. 2d 1, 23 (1995), quoting 
People v. Peeples
, 155 Ill. 2d 422, 455-56 (1993). Although a defendant in a criminal case may offer evidence that tends to show that someone else committed the offense with which he is charged, such evidence should be excluded on the basis that it is irrelevant if it is too remote or too speculative. 
People v. Whalen
, 158 Ill. 2d 415, 430-31 (1994); 
People v. Ward
, 101 Ill. 2d 443, 455 (1984).

In the case at bar, the circuit court properly excluded the evidence of Warner’s possession of the knife as irrelevant to the murder charges against defendant. Evidence that Warner was in possession of the knife on June 20 was too remote to demonstrate that Warner, rather than defendant, possessed the knife at the time of the Brewer murders. There was no dispute in this case that the knife used to murder the Brewers belonged to Warner and was in his possession prior to August 8. Warner testified, however, that defendant stole the knife from his house on August 8 before leaving to kill the Brewers. Evidence that Warner possessed the knife on June 20 did not undermine Warner’s claim that defendant stole the knife.

Defendant asserts that Warner’s use of the knife on June 20 in a drug offense supports a conclusion that he was the one who used it to obtain drug money from the Brewers on August 8. There was no evidence, however, that Warner was involved in a drug offense on June 20. Thus, there is no connection between Warner’s possession of the knife during the traffic stop on June 20 and the Brewer murders on August 8. The conclusion that because Warner possessed the knife on June 20 he was the one who used it to kill the Brewers on August 8 is speculative. Accordingly, we decline to find an abuse of discretion or a constitutional violation in the circuit court’s exclusion of this evidence.

C. 
Accomplice Witness Instruction

Defendant also claims error at trial based on the circuit court’s refusal to give the jury the “accomplice witness instruction” contained in Illinois Pattern Jury Instructions, Criminal, No. 3.17, which provides:

“When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case.” Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992) (hereinafter IPI Criminal 3d).

Defendant proposed this instruction at the instruction conference, but the State objected, and the circuit court refused the instruction.

The test for determining whether a witness is an accomplice for purposes of the accomplice witness instruction is whether there is probable cause to believe that the witness was guilty of the offense at issue as a principal or as an accessory under a theory of accountability. 
People v. Harris
, 182 Ill. 2d 114, 144 (1998).

“Thus, an accomplice-witness instruction should be given to a jury if the totality of the evidence and the reasonable inferences that can be drawn from the evidence establish probable cause to believe not merely that the person was present and failed to disapprove of the crime, but that he participated in the planning or commission of the crime; if probable cause is established the instruction should be given despite the witness’ protestations that he did not so participate.” 
People v. Henderson
, 142 Ill. 2d 258, 315 (1990).

A reviewing court will not overturn a circuit court’s refusal to give an accomplice witness instruction absent an abuse of discretion. 
Harris
, 182 Ill. 2d at 144.

Defendant argues that the accomplice witness instruction should have been given because Warner could have been indicted for the Brewer murders as a principal or under an accountability theory. Defendant relies on evidence that the murder weapon belonged to Warner, defendant had asked Warner for a weapon and had said he would do whatever it took to get money, Warner helped defendant burn his bloody clothing, Warner threw the knife into the Kaskaskia River, and Warner did not speak to police for five days after the murders. Defendant claims that Warner’s actions in covering up the crime suggest a consciousness of guilt and that Warner’s version of events could have been an effort to frame defendant. In addition, defendant contends that the evidence of his DNA on the cigarette butt at the murder scene was not inconsistent with a conclusion that Warner was an accomplice. According to defendant, Warner could have planted the cigarette butt at the scene, defendant could have been at the scene after the murders occurred, Warner could have transferred defendant’s DNA onto the cigarette butt because he and defendant had shared a crack pipe before the murders, or the cigarette butt could have fallen out of a car driven by Warner at the murder scene. Defendant also argues that Warner could have left Bonnie Brewer’s blood in defendant’s car.

After carefully reviewing the record in defendant’s case, we find that the circuit court properly denied defendant’s request for an accomplice witness instruction. Although Warner admitted helping defendant to conceal evidence related to the Brewer murders after they occurred, defendant’s entitlement to an accomplice witness instruction was dependent on a showing of probable cause that Warner aided or abetted defendant in planning or committing the Brewer murders. There was no such evidence.

According to Warner’s uncontradicted testimony, he did not give defendant permission to use his knife and was not present at the murder scene. Based on defendant’s statements on August 7 and August 8, Warner may have thought that defendant planned to commit a crime when he left Warner’s house in the early morning hours of August 8, but mere knowledge that a crime is to be committed is not enough to show that a witness was an accomplice. See 
Henderson
, 142 Ill. 2d at 314. Similarly, admitted participation in a related but distinct offense, such as Warner’s admission to performing acts that constituted obstruction of justice, does not make a witness an accomplice. See 
Henderson
, 142 Ill. 2d at 314. Furthermore, defendant’s suggestions that Warner could have left Bonnie’s blood in defendant’s car and could have been responsible for the cigarette butt found in the Brewers’ yard are based on speculation and do not support a finding that Warner was an accomplice. For example, although the State’s expert testified that the DNA of one person could be transferred to the lips of another who shared a crack pipe, Warner was excluded as a source of the DNA found on the cigarette butt. Accordingly, the evidence was insufficient to support giving the accomplice witness instruction, and the circuit court did not abuse its discretion in denying defendant’s request for such an instruction. See, 
e.g.
, 
Harris
, 182 Ill. 2d at 144-45. We affirm defendant’s convictions.

III. Sentencing

Defendant does not challenge the jury’s verdict finding him eligible for the death penalty. He argues, however, that several errors that occurred during the second stage of his sentencing proceedings require that his sentence be vacated and that he receive a new sentencing hearing. Defendant contends that he was denied a fair second stage sentencing hearing (1) by remarks the State made during its opening statement and closing argument; (2) by the circuit court’s refusal to permit defense counsel to argue residual doubt; and (3) by the circuit court’s refusal to instruct the jury as to his potential for rehabilitation.

A. 
Opening Statements and Closing Arguments

1. Statement Regarding Chicago Homicide

During the State’s opening statement at the second stage of defendant’s sentencing hearing, one of the prosecutors made the following reference to the recovery of a gun defendant took in his 1993 burglary of the Lust residence:

“You are going to hear how he took revolvers from that particular house; how when the heat was on, he threw the revolvers again into the–a body of water–in this case–by his own statement, into the Kaskaskia River. That’s what he told police. *** But we are also going to learn that one of the weapons he said he threw into the river, at that time the police were unable to recover, was later found during an investigation in 1996 in Chicago, Illinois into another homicide, and the weapon itself was used in a homicide.”

Defendant made no objection to this argument. Later that day, however, defense counsel asked the circuit court to bar any reference to the gun or to what happened to it in Chicago. The circuit court ruled that the State could present evidence that the gun was recovered but not that it was used in a homicide in Chicago.

Defendant now argues that the State’s reference to the homicide in Chicago was irrelevant, unreliable, and prejudicial because it left the jury with the impression that defendant committed a murder in Chicago or bore some responsibility for it. As the State observes, defendant has waived this issue for review by failing to make a timely objection to the portion of the State’s opening statement that he now challenges. See 
People v. Brown
, 185 Ill. 2d 229, 252 (1998). Defendant does not argue that any of the recognized exceptions to the waiver doctrine apply and does not claim ineffective assistance of trial counsel. We, therefore, decline to address the merits of defendant’s argument.

2. Argument That the Jury Could Not Consider Mercy

Defendant also claims prejudice at the second stage of sentencing based on the State’s argument regarding the jury’s consideration of mercy. During closing arguments at the aggravation-mitigation stage, defense counsel argued:

“The last thing that I need to speak to you about is of mercy. I think certainly many of you may have the desire to be merciful to Brad, and I think that is sufficient mitigation. *** Mercy is what we show our enemies. It’s kindness where it’s most difficult to be kind. *** And mercy is mitigation.”

In its rebuttal argument, the State responded as follows:

“Counsel for the defendant talked to you about mercy, and the Court is going to read to you that ‘You are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling.’ And I am not going to suggest to you that –[well] mercy clearly falls within that. I am not going to suggest–

[Defense counsel]: Objection.

THE COURT: The objection shall be overruled. This is comments of counsel, counsel’s argument. I shall allow counsel to respond.

* * *

[State]: Mercy falls within the definitions of sentiment, sympathy or passion. I would suggest to you that her argument is not based on the law.

[Defense counsel]: I object.

THE COURT: The objection shall be overruled. This is the arguments of counsel, and the Court is going to allow the arguments.

[State]: Not based upon the law the Court will read to you.”

The circuit court denied defendant’s request that the jury receive instructions informing it that it could consider mercy in determining the appropriate penalty at aggravation-mitigation. See, 
e.g.
, 
Buss
, 187 Ill. 2d at 235 (defendant’s instructions regarding the jury’s consideration of mercy were properly refused);
 Hope
, 168 Ill. 2d at 46-47 (same).

Defendant contends that the State misstated the law in its argument by suggesting that jurors could not consider mercy and that, when the circuit court overruled defendant’s objections to this argument, it indicated to jurors that the State was correct in asserting that the defense argument regarding mercy was not based on the law. According to defendant, he must receive a new sentencing hearing because “[t]he defense appeal for mercy by any single juror, resulting in a natural life sentence based on [defendant’s] good prison behavior, his good work record, his generally non-violent criminal history, and his brain damage was devastated by the prosecutor’s argument in conjunction with the Court’s overruling of the defense objections.”

At oral argument, the State conceded that its argument regarding mercy at the second stage of the sentencing proceedings was improper. The State asserts, however, that its argument was not so prejudicial as to require vacation of defendant’s sentence and a new sentencing hearing.

Under the precedent of this court, mercy is a relevant mitigating factor, and the prosecution may not argue that the jury may not consider mercy. See, 
e.g.
, 
Buss
, 187 Ill. 2d at 244-45. Nevertheless, we agree with the State that its argument regarding the jury’s consideration of mercy does not require that defendant receive a new sentencing hearing. In 
People v. Hall
, No. 86168 (December 1, 2000), this court found that any error resulting from the circuit court’s explanation to the jury regarding its consideration of mercy at the aggravation-mitigation phase was harmless. In 
Hall
, the circuit court sustained the State’s objections to defense counsel’s argument that the jury could consider mercy. In doing so, the circuit court stated: “ ‘Mercy  is, as defined in the case law, the part that says you can consider it, its defined as that natural feeling of sympathy for something that may arise from certain evidence ***. That is a natural reaction. Feeling those kinds of feelings are appropriate to consider. Showing mercy is a different thing.’ ” 
Hall
, slip op. at 22. This court concluded that, to the extent the circuit court’s explanation indicated that mercy differed from other mitigating factors the jury could consider, it was error. However, we held that any such error in the court’s oral explanation was harmless in light of the fact that the jury received proper written instructions at sentencing.

As in 
Hall
, the jury in defendant’s case was properly instructed according to IPI Criminal 3d No. 7C.01 (“You are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling”) and No. 7C.06 (“Mitigating factors include: *** Any other reason supported by the evidence why the defendant should not be sentenced to death”). A reasonable juror interpreting these instructions would disregard the emotion of sympathy yet appropriately base his or her sentencing decision on the mitigating evidence and any feelings of sympathy or mercy it elicited. 
Hall
, slip op. at 21-22. Given these instructions, as well as the circuit court’s instruction to the jury that arguments not based on the evidence should be disregarded, we hold that, under 
Hall
, any error resulting from the State’s argument about mercy was harmless.

3. Argument That Defense Counsel Tried to “Dupe” the Jury

Defendant also contends that he was deprived a fair sentencing hearing when, during its closing argument at aggravation-mitigation, the State accused defense counsel of deceiving the jury. Defendant bases this argument on two portions of the State’s argument. In the first portion, the State argued as follows:

“We go to the Lust house and we find out again he is wearing gloves. Let me talk to you about duty, about misdirection in a case. The defendant through his counsel suggested to you days ago in the guilt phase of this trial the lack of fingerprint evidence. They say the lack of fingerprint evidence would show you that there is a reasonable doubt as to the defendant’s guilt. What did we finally learn? We learned what we knew all along. That the lack of fingerprint evidence alone is reason to believe this defendant is guilty.

[Defense counsel]: I object, Judge.

THE COURT: The objection shall be overruled. Both counsel may make what they consider to be reasonable inferences of the evidence.

You may proceed, counsel.

[State]: He told his co-defendant in the Lust case, put on your, quote, God damn gloves when they were in the house. The argument that because there were no fingerprints in the Brewer house, therefore, it’s – there is a reasonable doubt as to this defendant’s guilt, when you paint it in light of this particular defendant’s knowledge of the use of gloves and how it will not leave prints, is less than remarkable. It’s another example of what I showed you in People’s Exhibit 12,
(footnote: 1) his desire to make you believe there is something that is just simply not true.”

Subsequently, the State argued:

“Ladies and gentlemen, just as I suggested to you, the lack of fingerprint evidence in their earlier argument was an attempt to dupe you because we now know the truth about it–

[Defense counsel]: I object, Judge.

THE COURT: The objection shall be overruled.

[State]: –so is the evidence from Ph.D. Hess that he has a brain injury, and therefore, we should feel sympathy for him because he got hit in the head with a baseball by his own statement back in grade school. What else do we know about that? Is there any evidence that he was in trouble from the time he was in grade school, from 9 to 12 years of age, until he hit the age of 20 and 21 as he began to choose to engage in this life of crime?”

Defendant contends that these arguments were improper and prejudicial because they diminished defense counsel’s credibility and shifted the jury’s attention from the evidence to defense counsel’s objectives. In addition, defendant contends that the State’s comments were inaccurate because the absence of fingerprint evidence at the Brewer house supported defense counsel’s argument that someone other than defendant committed the murders.

Prosecutors are afforded wide latitude in closing argument. 
People v. Redd
, 173 Ill. 2d 1, 44 (1996). A “prosecutor’s comments in closing argument will result in reversible error only when they engender ‘substantial prejudice’ against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence.” 
People v. Macri
, 185 Ill. 2d 1, 62 (1998). Challenged remarks must be viewed in the context of closing arguments as a whole. 
People v. Burgess
, 176 Ill. 2d 289, 319 (1997).

The State may challenge a defendant’s credibility and the credibility of his theory of defense in closing argument when there is evidence to support such a challenge. 
People v. Hudson
, 157 Ill. 2d 401 (1993). It is well established, however, that “ ‘
[u]nless based on some evidence
, statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper. [Citations.]’ ” (Emphasis in original.) 
Jackson
, 182 Ill. 2d at 81, quoting 
People v. Emerson
, 97 Ill. 2d 487, 497 (1983).

In this case, after carefully reviewing the State’s remarks in context, we find that they were a proper comment on the credibility of the defendant and his theory of defense rather than an impermissible attack on defense counsel. In a case involving a similar argument by the State, 
People v. Hudson
, 157 Ill. 2d 401 (1993), this court rejected the defendant’s contention that the State’s remarks were an improper attack on defense counsel. The State argued:

“ ‘You know, this whole defense of insanity on these facts would be laughable if we weren’t dealing with such a serious case, such an important case. This whole theory the defense has concocted to present to you here in court would be laughable. But it’s not laughable.’ ” 
Hudson
, 157 Ill. 2d at 442.

This court determined that because these comments did “not sufficiently refer to defense counsel or attribute any particular wrongdoing to him,” they did not suggest that defense counsel fabricated a defense. 
Hudson
, 157 Ill. 2d at 443. Instead, this court decided that the State’s argument was a comment on the credibility of the defendant. 
Hudson
, 157 Ill. 2d at 443.

As in 
Hudson
, the challenged portions of the State’s argument in defendant’s case do not sufficiently refer to defense counsel. In the first portion of the challenged argument, the prosecutor attributed “misdirection” to “defendant through his counsel.” In the second portion, the prosecutor stated that “their argument” was an attempt to “dupe” the jury. A central theme of the State’s argument was that defendant was attempting to present to the jurors an image of himself that was not the truth. For example, the State argued that defendant had changed his appearance between the time of his arrest and the time of trial to become more clean-cut and that, although defendant presented testimony that he performed well in a high school home economics class, defendant had made bomb threats to the high school. In this context, we interpret the challenged comments as a criticism of defendant’s credibility rather than an attack on defense counsel. See also
 People v. Hope
, 137 Ill. 2d 430 (1990) (in context, the State’s argument was a comment on the implausibility of the defense theory rather than an accusation against defense counsel of fabrication or trickery).

In support of his argument that the State’s remarks require that he receive a new sentencing hearing, defendant cites several cases in which this court has found reversible error based on closing arguments in which the State has accused defense counsel of trickery or deception. For example, in 
People v. Kidd
, 147 Ill. 2d 510 (1992), this court held that the defendant was entitled to a fair trial based on the State’s argument that defense counsel was attempting to trick the jury. In one portion of the argument, the State argued:

“ ‘In reality, ladies and gentlemen, the defense attorneys in this case, the real defense is to create as much side issues, to create as much confusion as possible so that when you go into the jury room, you are diverted from the real facts, the real issues *** and you chase after all these loose ends or side issues or side defenses that [defense counsel] just tried to raise in his closing argument.

I submit to you, ladies and gentlemen, that the defenses raised in this case are similar to a smoke screen.
’ ” (Emphasis in original.) 
Kidd
, 147 Ill. 2d at 541.

This court found the “smokescreen” argument particularly prejudicial because the defendant was accused of arson resulting in the deaths of 10 children. In addition, the fact that the State made eight “smokescreen” comments distinguished the case from others in which this court had declined to find reversible error based on “passing references” to a smokescreen theme. 
Kidd
, 147 Ill. 2d 510; see also, 
e.g.
, 
Emerson
, 97 Ill. 2d at 497 (finding reversible error based on the State’s argument that “defense counsel had laid down a smokescreen ‘composed of lies and misrepresentations and innuendoes’ ” and that “all defense attorneys try to ‘dirty up the victim’ to distract the attention of the jury from the defendant’s crime”); 
People v. Monroe
, 66 Ill. 2d 317, 323 (1977) (finding reversible error based on the State’s argument that “ ‘[defense counsel’s] closing argument is fraudulent’ ” and that defense counsel did not believe his own argument).

Unlike defendant’s case, the cases on which defendant relies involved direct references to defense counsel and repeated accusations of deceit. By contrast, the challenged comments in defendant’s case were brief and properly directed against the credibility of defendant and his theory of defense. Thus, under 
Hudson
, no new sentencing hearing is required.

4. Prohibiting the Defense From Arguing Residual Doubt

Defendant raises a second argument based on these same two portions of the State’s argument. According to defendant, the circuit court erred by refusing to permit him to argue residual doubt as a response to the State’s comments about the strength of the evidence supporting his murder convictions. Defendant asserts that this error requires resentencing.

During closing arguments at the aggravation-mitigation stage of sentencing, the circuit court sustained the State’s objection to defense counsel’s residual doubt argument:

“Now the other thing that is mitigation is any bit of doubt that remains with you–

[State]: Objection. Objection if we are going to argue reasonable doubt. It is an improper argument.

THE COURT: You may complete your statement, and I will hear the objection.

[Defense counsel]: That if there is doubt that remains with you about what happened–

[State]: Objection.

THE COURT: Let her complete her question.

[Defense counsel]:–on the night in question, then you can consider that.

THE COURT: The objection shall be sustained.

[Defense counsel]: You know, your decision today, whatever it is, can’t be changed. And if in time you learn something about this that’s different, you are going to have to live with that.

[State]: Same objection.

THE COURT: Sustained.

[State]: I ask that they be instructed on that.

THE COURT: It shall be stricken.”

Defendant acknowledges that a defendant ordinarily has no right to argue residual doubt. Both this court and the United States Supreme Court have held that a defendant is not entitled to present evidence of residual doubt at the penalty phase of sentencing proceedings. See, 
e.g.
, 
Franklin v. Lynaugh
, 487 U.S. 164, 172-75, 101 L. Ed. 2d 155, 165-66, 108 S. Ct. 2320, 2327-28 (1988); 
People v. Emerson
, 189 Ill. 2d 436, 503 (2000); 
People v.
 
Terrell
, 185 Ill. 2d 467, 500-01 (1998); 
People v. Hooper
, 172 Ill. 2d 64, 79 (1996); 
People v. McDonald
, 168 Ill. 2d 420, 454-55, (1995). The rationale for these holdings is that “[r]esidual doubt is not relevant to the circumstances of the offense or to the defendant’s character and, as a result, is not relevant to the imposition of the death penalty.” 
Hooper
, 172 Ill. 2d at 79.

Defendant contends, however, that an otherwise improper argument may be permitted if it is invited by the other party. According to defendant, the circuit court in this case erred by prohibiting defense counsel’s residual doubt argument because it was a proper response to the State’s improper argument concerning the sufficiency of the evidence. As defendant observes, this court has held that otherwise improper argument by the State will not be considered error when invited by the defendant’s argument. See, 
e.g.
, 
Kliner
, 185 Ill. 2d at 153; 
People v. Brown
, 172 Ill. 2d 1, 43 (1996); 
People v. Mahaffey
, 128 Ill. 2d 388, 423-25 (1989). Defendant has provided us with no authority for the proposition that an improper argument by defense counsel must be permitted when invited by the State’s argument. Even assuming, however, that in some cases fairness may require that a defendant be permitted to make such a response to the State’s argument, we do not believe that this is such a case.

During closing argument at the second stage of sentencing, the State is entitled to argue that the nature and circumstances of a defendant’s crimes are aggravating. See, 
e.g.
, 
People v. Cloutier
, 178 Ill. 2d 141, 168 (1997). Thus, the State was entitled to argue at the aggravation-mitigation stage in this case that defendant’s previous use of gloves in a burglary and the lack of fingerprint evidence at the Brewer house suggested that he used gloves when committing the Brewer murders. The State’s comment on the sufficiency of the evidence supporting defendant’s convictions, however, did not pertain to the circumstances of the offense or to defendant’s character or record and were consequently not relevant to the imposition of the death penalty. See
 Hooper
, 172 Ill. 2d at 79. Nevertheless, this irrelevant argument by the State did not require that the circuit court permit defendant to argue residual doubt.

The circuit court is able to observe trial proceedings and is in the best position to evaluate the prejudicial effect of remarks in closing argument. 
People v. Howard
, 147 Ill. 2d 103, 168 (1991). Reviewing courts, therefore, afford the circuit court discretion to determine the proper character and scope of argument and indulge every reasonable presumption that the circuit court properly exercised its discretion. 
People v. Cloutier
, 156 Ill. 2d 483, 507 (1993).

In the case at bar, little, if any, prejudice resulted from the State’s brief reference to the strength of the evidence to support defendant’s convictions, particularly in light of the fact that the jury had already decided to convict defendant of the Brewer murders. Thus, we do not believe defendant was denied a fair sentencing hearing when the circuit court refused to permit him to respond by arguing residual doubt. As stated, a defendant is not entitled to argue residual doubt, and we hold that the circuit court did not abuse its discretion in failing to make an exception to this rule in defendant’s case as a result of the State’s irrelevant arguments.

B. 
Failure to Instruct the Jury Regarding Defendant’s Potential for Rehabilitation

Defendant also claims reversible error based on the circuit court’s refusal, at the second stage of the sentencing proceedings, to instruct the jury that mitigating factors include that “[t]he defendant may be rehabilitated or restored to useful citizenship.” IPI Criminal 3d No. 7C.06 provides in relevant part:

“Mitigating factors include:

First: [(Any or all of the following) (The following)] if supported by the evidence:

* * *

The defendant may be rehabilitated or restored to useful citizenship.

Second: Any other reason supported by the evidence why the defendant should not be sentenced to death.

Where there is evidence of a mitigating factor, the fact that such mitigating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence.”

The instructions proposed by the prosecution followed the language of IPI Criminal 3d No. 7C.06, except that no mitigating factors, such as defendant’s potential for rehabilitation, were enumerated. The prosecution’s instruction stated only that mitigating factors included “any other reason supported by the evidence why the defendant should not be sentenced to death.”

At the instruction conference, defense counsel objected to this omission but did not tender an alternative instruction. The circuit court overruled defendant’s objection and gave the jury IPI Criminal 3d No. 7C.06 in the form proposed by the State.

Defendant now contends that the circuit court’s failure to instruct the jury that defendant’s potential for rehabilitation was a mitigating factor violated the eighth amendment to the United States Constitution, as well as article I, section 11, of the Illinois Constitution, which provides that “[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.” According to defendant, there was significant evidence of his potential for rehabilitation, including his charity, good behavior, and good work record in prison; his artistic talent, his interest in religion, his positive relationship with his girlfriend’s daughter, and the availability of medication to treat the problems associated with his brain damage. Defendant asserts that the failure of the circuit court to instruct the jury to consider his potential for rehabilitation “diminished, if not eliminated, the jury’s consideration of that type of mitigation” and “handicapped counsel’s ability to advocate the mitigation evidence in those terms.” As a result, defendant argues, he is entitled to a new sentencing hearing.

It is well established that a defendant is entitled to have the jury instructed on the theory of his case. 
Gilliam
, 172 Ill. 2d at 519. If there is some basis for such an instruction in the evidence, it is an abuse of the discretion for the circuit court to refuse the instruction. See, 
e.g.
, 
People v. Crane
, 145 Ill. 2d 520, 526 (1991).

The State asserts that the circuit court properly refused to instruct the jury concerning defendant’s potential for rehabilitation because the evidence at the aggravation-mitigation stage did not support such an instruction. However, “[v]ery slight evidence upon a given theory of a case will justify the giving of an instruction.” 
People v. Jones
, 175 Ill. 2d 126, 132 (1997). Defendant presented evidence that he was a good worker and had been involved in charitable activities both in and out of prison; he had been kind to other inmates and children; and he had sincere religious beliefs. In addition, Dr. Hess testified that the symptoms of defendant’s brain damage could be treated with medication. Based on this evidence, we find that the circuit court erred in refusing defendant’s request that the jury be instructed that mitigating factors included his potential for rehabilitation and useful citizenship.

Nevertheless, we disagree with defendant that this error requires that he receive a new sentencing hearing. “An error in a jury instruction is harmless if the result of the trial would not have been different if a proper instruction had been given.” 
People v. Alvine
, 173 Ill. 2d 273, 290 (1996). In the case at bar, the circuit court’s instructional error was harmless.

This court has previously explained:

“It is well established that at the aggravation/mitigation stage of sentencing, the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. [Citations.] The standard for determining whether jury instructions violate the protections of the eighth and fourteenth amendments is ‘ “whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.” ’ ” 
Terrell
, 185 Ill. 2d at 517-18, quoting 
Buchanan v. Angelone
, 522 U.S. 269, 276, 139 L. Ed. 2d 702, 710, 118 S. Ct. 757, 761 (1998), quoting 
Boyde v. California
, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 329, 110 S. Ct. 1190, 1198 (1990).

In defendant’s case, although the jury was not specifically instructed that defendant’s potential for rehabilitation was a mitigating factor, it was instructed that mitigating factors included “[a]ny other reason supported by the evidence why the defendant should not be sentenced to death.” In addition, both the prosecution and the defense argued defendant’s potential for rehabilitation to the jury. The State argued that the evidence did not indicate that defendant could be rehabilitated, while the defense contended that the evidence showed a “real hope” for defendant’s rehabilitation. Thus, we find no reasonable likelihood that the jury believed it could not consider evidence of defendant’s potential for rehabilitation and restoration to useful citizenship.

In addition, this court has held that failing to instruct the jury at the second stage of a capital sentencing hearing to consider a defendant’s potential for rehabilitation and restoration to useful citizenship does not violate article I, section 11, of the Illinois Constitution of 1970, provided that the jury is instructed that it can consider “any other reason” why the defendant should not be sentenced to death. See 
People v. Free
, 94 Ill. 2d 378, 420-21 (1983).

Further, defendant had a significant criminal history, involving bomb threats to schools, burglaries, threats of violence, and actual violence. He continued to commit criminal offenses, even after completing sentences of probation and imprisonment. Ultimately, he approached the Brewer household, apparently at random, seeking money to support his cocaine habit. In order to get the money he wanted, defendant brutally murdered an elderly couple with mobility problems and their daughter, who was recovering from surgery, in the middle of the night. He stabbed Charles Brewer, dragged him across the lawn of his house, and left him lying by the side of his house. He stabbed Doris Jean Brewer 16 times, fracturing her skull, and stabbed Bonnie Brewer 20 times. Given the strength of the aggravating evidence, as well as the arguments and instructions at the second stage of defendant’s sentencing hearing, we believe that the jury’s sentencing decision would have been the same, even if the circuit court had not failed to instruct the jury concerning defendant’s potential for rehabilitation and restoration to useful citizenship. Accordingly, we hold that defendant is not entitled to a new sentencing hearing on this basis.

IV. Constitutionality of the Death Penalty

Defendant also raises several constitutional challenges to his sentence. He first argues that this court should hold the Illinois death penalty statute unconstitutional because current procedural safeguards are inadequate to minimize the risk that innocent people will be executed and because it is inevitable that such executions will occur. These are essentially the same arguments as those rejected in this court’s recent decision in 
People v. Bull
, 185 Ill. 2d 179, 211-20 (1998), and we decline to reconsider that holding. See also 
People v. Williams
, 192 Ill. 2d 548 (2000); 
People v. Moore
, 189 Ill. 2d 521 (2000); 
People v. Brooks
, 187 Ill. 2d 91, 141 (1999); 
Brown
, 185 Ill. 2d at 260. This court has also previously held that the death penalty statute is not unconstitutional on the basis that it (1) precludes meaningful consideration of mitigating evidence (see, 
e.g.
, 
Kliner
, 185 Ill. 2d at 177-78); (2) permits the sentencing body to consider the “vague” aggravating factor of “any other reason” the defendant should be sentenced to death (see, 
e.g.
, 
Hope
, 168 Ill. 2d at 48); (3) fails to sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences (see, 
e.g.
, 
Kliner
, 185 Ill. 2d at 177-78); (4) gives prosecutors unrestricted discretion to seek capital punishment (see, 
e.g.
,
 People v. Fair
, 159 Ill. 2d 51, 96 (1994)); (5) does not require prosecutors to give defendants pre-trial notice of intent to seek the death penalty (see, 
e.g.
, 
People v. Armstrong
, 183 Ill. 2d 130, 162 (1998)); (6) provides limited comparative proportionality review of death sentences (see, 
e.g.
, 
People v. Harris
, 164 Ill. 2d 322, 351 (1994)); (7) does not require the sentencing body to make written findings (see, 
e.g.
, 
Emerson
, 189 Ill. 2d at 514); (8) permits the sentencing body to consider nonstatutory aggravating factors (see, 
e.g
., 
People v. Collins
, 106 Ill. 2d 237, 285 (1985)); (9) does not limit aggravating evidence to matters disclosed before trial (see, 
e.g.
, 
Harris
, 182 Ill. 2d at 161); (10) does not place a burden of proof on the prosecution (see, 
e.g.
, 
Cloutier
, 178 Ill. 2d at 173-74); (11) contains language that places a burden of proof on the defendant (see, 
e.g.
, 
Kliner
, 185 Ill. 2d at 177-78; 
People v. Johnson
, 182 Ill. 2d 96, 112 (1998)); and (12) does not permit the sentencing body to consider the exact range of sentences available if the death penalty is not imposed (see 
People v. Childress
, 158 Ill. 2d 275, 318 (1994)). Defendant has not persuaded us to overturn these decisions. We also reject his contention that, together, these features of the death penalty statute render it unconstitutional. As this court stated in 
Childress
, “ ‘[i]f all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional.’ ” 
Childress
, 158 Ill. 2d at 318, quoting 
People v. Phillips
, 127 Ill. 2d 499, 542-43 (1989); see also, 
e.g.
, 
People v. Woolley
, 178 Ill. 2d 175, 215 (1997); 
People v. Edgeston
, 157 Ill. 2d 201, 247 (1993).

CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed. We direct the clerk of this court to enter an order setting Wednesday, March 21, 2001, as the date on which the sentence of death, entered by the circuit court of Macon County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

Affirmed.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Kirchner’s murder convictions should not be disturbed. In my view, however, his sentence of death cannot be allowed to stand.

Contrary to the majority, I would hold that the circuit court abused its discretion when it excused James Rentfro from the jury for cause. A trial court may not exclude a prospective juror for cause because the juror voices general religious or conscientious reservations about capital punishment. Removal for cause is permissible only if the juror’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. 
People v. Shaw
, 186 Ill. 2d 301, 316 (1998). That standard does not appear to have been met here.

Juror Rentfro specifically stated that in spite of his personal feelings regarding the death penalty, he would be able to fulfil his duty to weigh the evidence and follow the law as instructed by the court. Although the court’s follow-up question raised uncertainty about that answer, Rentfro’s views are, at most, ambiguous. Based on the record before us, we cannot say with any certainty what Rentfro’s answer to the follow-up question actually meant.

The majority resolves the ambiguity by deferring to the trial judge. In my view, however, such deference is unwarranted under the circumstances present here. Yielding to the trial judge would be appropriate only if he saw or heard something not reflected in the written record. The majority does not explain what that something might be, and I am at a loss to understand it. No matter what Rentfro’s demeanor might have been, no matter what inflection his voice might have possessed, the meaning of his terse response would still be unclear.

Given the ambiguity created by the trial judge’s follow-up question, the appropriate course would have been to seek further clarification from Rentfro. Such an approach would not have caused any undue delay and would have ensured that the jury-selection process was free from taint. To have excluded Rentfro without taking this simple measure constitutes error, entitling Kirchner to a new sentencing hearing. 
People v. Shaw
, 186 Ill. 2d 301, 360-61 (1998) (Harrison, J., concurring in part and dissenting in part).

Kirchner is also entitled to a new sentencing hearing based on the trial judge’s mishandling of the issue of mercy. Our court has specifically held that a jury may properly consider mercy as a mitigating factor at a capital sentencing hearing. 
People v. Buss
, 187 Ill. 2d 144, 234-35 (1999). Defense counsel in this case, however, was not permitted to argue mercy to the jury. When he attempted to broach the issue of mercy, the trial judge sustained the State’s objections, then gave an explanation to the jury which suggested that mercy was not an appropriate factor for it to consider.

There is no merit to my colleague’s assertion that the court’s erroneous oral discussion of mercy was cured by IPI Criminal 3d No. 7C.06. Under that instruction, mitigating factors which the jury is entitled to consider include “[a]ny other reason supported by the evidence why the defendant should not be sentenced to death.” IPI Criminal 3d No. 7C.06. This language has been found sufficient to advise the jury that it may take mercy into account in reaching its decision. If IPI Criminal 3d No. 7C.06 is given, no separate, additional instruction on mercy is required. 
 Buss
, 187 Ill. 2d at 235. Where our court has found IPI Criminal 3d No. 7C.06 sufficient, however, we have also observed that defense counsel was allowed to argue for mercy in his closing statement. See 
People v. Miller
, 173 Ill. 2d 167, 199 (1996); 
People v. Pitsonbarger
 142 Ill. 2d 353, 405 (1990); People
 v. Sanchez
, 115 Ill. 2d 238, 269-70 (1986). As previously indicated, defense counsel here did not have that opportunity. When he argued to the jury that mercy is a relevant, mitigating factor, “one of those any other reasons supported by the evidence,” the State objected and its objection was sustained.

By sustaining the State’s objection, the court told the jury, in effect, that mercy does not fall within the mitigating factors it could consider under IPI Criminal 3d No. 7C.06. Because the jury was told that mercy was not one of the mitigating factors defined by IPI Criminal 3d No. 7C.06, submitting IPI Criminal 3d No. 7C.06 could not possibly have sufficed to advise the jury that it could properly take mercy into account as a mitigating factor. To the contrary, because of the court’s ruling on the State’s objection to defense counsel’s explanation, the effect of IPI Criminal 3d No. 7C.06, with respect to the issue of mercy, was specifically negated. After hearing the judge’s remarks, no reasonable juror could would have thought that mercy could still be considered. That is not harmless error. It is grounds for a new sentencing hearing.

Even if the foregoing errors did not entitle Kirchner to a new sentencing hearing, his death sentence could not be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in
 People v. Bull
, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). Kirchner’s sentence of death should therefore be vacated and he should be sentenced to a term of imprisonment. 720 ILCS 5/9–1(j) (West 1998). Because Kirchner was found guilty of murdering more than one victim, the term of his imprisonment must be natural life. 730 ILCS 5/5–8–1(a)(1)(c)(ii) (West 1998).

FOOTNOTES
1:     
1
People’s Exhibit 12 was a mugshot of defendant in which his hair was long. The record indicates that defendant cut his hair before trial.