2020 IL App (1st) 181806

FIRST DISTRICT,
FIRST DIVISION
September 8, 2020

No. 1-18-1806

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 13 CR 1952 |
| | ) | |
| DAVID MAYBERRY, | ) | Honorable |
| | ) | Neil J. Linehan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE COGHLAN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a shooting incident on October 7, 2012, defendant David Mayberry was convicted of the attempted murders of Sedgwick Reavers, Marlon Triplett, Sharrod Corhn, Anthony Wise, and Daniel Willis. On appeal, Mayberry argues that his conviction must be reversed because (1) the trial court admitted improper hearsay testimony that "Lil Dave from our hood" was the shooter, (2) the trial court erred by excluding evidence that an alternate suspect committed the shootings, and (3) Mayberry's counsel was ineffective for failing to move to suppress Willis's identification of him. We disagree and affirm.

¶ 2                                I. BACKGROUND

¶ 3    At around 4:30 p.m. on October 7, 2012, Reavers was driving to his home in the Roseland area of Chicago, accompanied by his brother Triplett and his friends Corhn and Wise. Reavers parked outside the house, and the four men exited the car. As they were walking to the house, a man opened fire on them from behind.

¶ 4    Corhn testified that when he heard the gunshots behind him, he fled without looking back to see who the shooter was. Corhn, Triplett, and Wise all ran into the gangway alongside the house. (Corhn did not see what happened to Reavers.) At the end of the gangway was a small gate, which Triplett and Wise jumped over; Corhn climbed over the gate, slower than the others because he had been shot in the foot. He could still hear gunfire behind him as he was climbing.

¶ 5    By the time Corhn made it over the gate, Wise was gone. Triplett, who had also been shot, was lying on the ground. Corhn helped Triplett to his feet and asked, "Who was that?" Triplett did not reply. With Triplett limping from his injuries, the two of them jogged a couple blocks to a neighbor's house and told them to call an ambulance. Once they were inside, Corhn again asked, "Who was that?" Triplett said, "Lil Dave from our hood." The defense raised a hearsay objection to this testimony, but the trial court admitted it as an excited utterance.

¶ 6    Reavers testified that when he heard the gunshots, he looked behind him and saw the shooter, then ran for the gangway with the others. As he reached the gangway, he was shot in the hip and fell to the ground, unable to run farther.

¶ 7    The shooting was witnessed by Willis, an off-duty Chicago police officer who lived in Roseland. Willis was driving home in his personal vehicle when he saw a man step from between two parked cars and fire at a group of men standing across the street. Willis estimated he was around 30 to 50 feet away from the shooter when he initially saw him.

¶ 8    Willis observed the victims run into a nearby gangway. The shooter briefly pursued them, crossing in front of Willis's car, and then came back the other way, again crossing in front of Willis's car before running into an alley. Willis drove into the alley, accelerated, and hit a speed bump, causing his car to go "up in the air" and then stop. The shooter also stopped, turned

around, and fired two shots at Willis's car, striking the windshield. He was standing approximately 50 feet away and Willis could see his face.

¶ 9        Willis opened his car door and, while using the door as cover, fired around six shots at the shooter. The shooter fled. Willis cautiously drove to the exit of the alley, but the shooter was nowhere in sight. According to Willis, the entire exchange lasted around 30 to 45 seconds.

¶ 10        Afterwards, police and paramedics arrived on the scene. Reavers, Corhn, and Triplett were all taken to the hospital and treated for gunshot wounds. When Triplett was brought to the emergency room, he reported a pain level of 10 out of 10; he had a gunshot wound to the base of his penis, two gunshot holes on the front of his right scapula, and two gunshot holes on his right buttock. Meanwhile, at the scene, Willis described the shooter to police as a black man around 6'0" to 6'1" tall, with a light complexion and wearing a black skull cap, a black hoodie, and dark pants.

¶ 11        On the same day, Tiffany Davis was visiting her mother, who lived in Roseland around two blocks away from Reavers and Triplett's house. Shortly after 4:30 p.m., while Davis was in the living room, she heard gunshots and looked out the window to see what was happening. She saw a man wearing a black hoodie and dark pants walking down the sidewalk towards 107th Street. Davis watched him until he disappeared from her sight. Shortly afterwards, the man re-appeared, walking the other way. Then the man appeared a third time, again walking toward 107th Street, but he was no longer wearing the black hoodie; instead, he had on a white t-shirt. A silver Oldsmobile Alero pulled up nearby, the driver popped open the back door, the man jumped inside, and the car drove away. Davis estimated the entire encounter was 5 to 10 minutes long.

¶ 12    After the car left, Davis heard sirens and saw police in the area. She went outside and told the officers what she had seen. One of those officers was Officer Hernandez. After hearing Davis's story, Hernandez searched the area and, two-to-four houses away, found a black skull cap and a black hoodie behind a bush. Hernandez guarded the items until they were collected by an evidence technician.

¶ 13    In the days following the incident, Willis had several conversations with Charlene Hardley, who was Reavers and Triplett's grandmother. Hardley provided Willis with a name: David Mayberry. After their final conversation on November 8, 2012, Willis looked up David Mayberry on Facebook, found a picture of him, and recognized him as the shooter.[1]

¶ 14    Willis forwarded this information to detectives who were working on the case. Later that evening, detectives showed Willis an array of six photos, including Mayberry's photo. Willis identified Mayberry as the shooter and was "100 percent certain" of his identification. On the same day, police showed the same photo array to Davis, who identified Mayberry as the person she saw walking back and forth in front of her mother's house.

¶ 15    At trial, defense counsel vigorously cross-examined Willis regarding his identification. Counsel asked if it was true that Willis initially only gave police a vague description of the shooter as a black man in his 20s wearing black clothes. Counsel also asked: "[I]sn't it true that your memory of the incident got better, much better, after you saw the Facebook page?" Willis denied both of these things, saying that he gave police a detailed description and that Mayberry's face was "etched in [his] memory" from the actual incident. He stated that, as a former SWAT officer, he learned over the years to pay attention to details.

_____

[1]Willis also had multiple conversations about the case with Michelle Robinson, who was Reavers and Triplett's mother, but he could not recall whether she pointed him towards Mayberry's Facebook page.

¶ 16        Defense counsel additionally questioned Willis about the photo lineup. Willis acknowledged that the six lineup photos had different colored backgrounds—including light blue, yellow, and gray—but Mayberry's photo was the only one with a white background. Willis also acknowledged that Mayberry was the only light-skinned individual in the lineup.

¶ 17        On December 21, 2012, detectives interviewed Reavers, who was in prison for an unrelated offense. Reavers viewed a photo array and signed a photo of Mayberry. He also signed a lineup advisory form stating that he understood that he was not required to make an identification and that the suspect might or might not be in the photo lineup. Nevertheless, at trial, Reavers testified that he was "100 percent sure" that the shooter was not Mayberry, with whom he had been friends since he was 12 years old. He claimed that in the December 21 interview, the detectives asked him if he knew anyone in the photo array; he told them that he knew Mayberry and signed Mayberry's photo solely to signify that fact. He denied telling the detectives that Mayberry was the one who shot him. He admitted that he "beat [Mayberry] up" a week or two before the shooting, but he claimed the incident was not indicative of ill will between them, saying: "I fight with all my friends and brothers."

¶ 18        In contrast, Detective Danny Stover, one of the interviewing detectives, testified that Reavers identified Mayberry as the shooter. Reavers told Stover that he and Mayberry, who was also known as Lil Dave, were both members of the Black P. Stone Nation. A week or two before the shooting, Reavers got into a fight with Mayberry because he believed Mayberry had wronged a friend of his. During the shooting, while Reavers was lying in the gangway pretending to be dead, he saw that Mayberry was the shooter. Reavers signed the picture of Mayberry in the photo array, but then told Stover: "I'm not going to testify. I'm not coming to court. I'll let the streets take care of [Mayberry]."

¶ 19          Mayberry was arrested on December 28, 2012. The next day, Willis and Davis both identified Mayberry at an in-person lineup. A DNA sample from Mayberry was compared with DNA found on the hoodie recovered at the scene.[2] Three DNA profiles were present on the hoodie, one of which was identified as the major profile and matched Mayberry's DNA profile. This DNA profile would be expected to occur in approximately 1 in 240 quintillion black, 1 in 2.3 sextillion white, or 1 in 15 sextillion Hispanic unrelated individuals. Additionally, gunshot residue testing of the hoodie revealed gunshot residue on the left cuff, the right cuff, and the inside of the right front pocket.

¶ 20          Finally, Kimberly Hofsteadter, an employee at the Cook County Department of Corrections, published several phone calls made by Mayberry while he was in jail. In one of the calls, Mayberry discussed selling a silver Oldsmobile Alero.

¶ 21          The jury found Mayberry guilty of the attempted murders of Reavers, Triplett, Corhn, Wise, and Willis. Mayberry was sentenced to an aggregate term of 155 years' imprisonment.

¶ 22                                        II. ANALYSIS

¶ 23          Mayberry argues that his conviction must be reversed because (1) the trial court admitted improper hearsay testimony that "Lil Dave from [the] hood" was the shooter, (2) the trial court erred by excluding evidence that the gun used in the shooting was also used in another crime while Mayberry was in custody on this case, and (3) Mayberry's counsel was ineffective for failing to move to suppress Willis's identification of him. We consider these contentions in turn.[3]

---

[2]The skull cap did not contain any DNA profiles suitable for comparison.

[3]Although neither party has raised this issue, we note that Mayberry's 66-page opening brief exceeds the 50-page limit provided in Rule 341(b)(1). Ill. S. Ct. Rule 341(b)(1) (eff. May 25, 2018). We caution Mayberry's counsel that Rule 341's length limits are not inconsequential, and parties who exceed them do so at their peril. *Lundy v. Farmers Group, Inc.*, 322 Ill. App. 3d 214, 218 (2001). Nevertheless, we decline to strike the brief, as the excessive length does not impair our review of the issues. *Barrett v. Fonorow*, 343 Ill. App. 3d 1184, 1188 (2003) (declining to strike a brief for exceeding length limitations where rule violation did not hamper the court's review of the issues).

¶ 24                                    A. Triplett's Identification of Mayberry

¶ 25          Mayberry first argues that the trial court erred in allowing Corhn to testify that Triplett

told him "Lil Dave from [the] hood" was the shooter. The State argues that Triplett's statement

was correctly admitted as an excited utterance.

¶ 26          Mayberry acknowledges that he has forfeited this issue by failing to raise it in his

posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve issue for review,

defendant must both object at trial and raise the issue in a posttrial motion). Mayberry

nevertheless argues that we may consider the issue under the plain error doctrine, which allows

us to review "clear and obvious" unpreserved errors when either (1) the evidence is so closely

balanced that the error threatened to tip the scales against the defendant or (2) the error "is so

serious that it affected the fairness of the defendant's trial and challenged the integrity of the

judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 27          We begin by considering whether any error occurred. See *People v. Johnson*, 218 Ill. 2d

125, 139 (2005) ("Clearly, there can be no plain error if there is no error ***."). Hearsay is an

out-of-court statement, other than one made by the testifying declarant, offered to prove the truth

of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). In general, hearsay is inadmissible

(Ill. R. Evid. 802 (eff. Jan. 1, 2011)), but an exception exists for excited utterances, defined as

"statement[s] relating to a startling event or condition made while the declarant was under the

stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Apr. 26, 2012).

Such statements have enhanced reliability because when people are under physical or mental

shock, the stress of the situation typically causes them to express their genuine beliefs as to facts

they have just observed. *People v. Connolly*, 406 Ill. App. 3d 1022, 1024 (2011). Thus, for this

exception to apply, there must be (1) an event sufficiently startling to produce a "spontaneous

and unreflecting" statement, (2) an absence of time to fabricate, and (3) a relation between the statement and the circumstances of the event. *People v. Sutton*, 233 Ill. 2d 89, 107 (2009). Whether a statement qualifies as an excited utterance is within the discretion of the trial court. *Id.*

¶ 28     Mayberry does not contest that the shooting was a sufficiently startling event (see *People v. Elrod*, 190 Ill. App. 3d 1004, 1013 (1989) (gunshot wound is sufficiently startling to produce an unreflected response)) or that Triplett's statement related to the circumstances of the shooting. Rather, Mayberry argues that Triplett's statement was not an excited utterance because he was no longer experiencing an ongoing emergency by the time he identified "Lil Dave" as the shooter.

¶ 29     But the excited utterance exception is not limited to statements made during an ongoing emergency. Rather, the critical inquiry is "whether the statement was made while the excitement of the event predominated." (Internal quotation marks omitted.) *People v. Williams*, 193 Ill. 2d 306, 353 (2000). For instance, in *Elrod*, 190 Ill. App. 3d at 1013, a shooting victim made a statement to a detective while being wheeled into the emergency room within 10 minutes of the shooting. Although the shooting was already over, and the victim had been removed to a place of safety to receive medical care, his statement qualified as an excited utterance because the circumstances indicated that it "obviously sprang from the shock of the event and not from conscious deliberation or calculation." (Internal quotation marks omitted.) *Id.* at 1014; see also *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 71 (shooting victim's statement to police qualified as an excited utterance even though it occurred an hour and a half after the shooting, while the victim was being treated in the emergency room).

¶ 30     Here, Triplett identified "Lil Dave" as the shooter immediately after being ambushed and shot and then limping a couple blocks to a neighbor's house. He was sitting in the vestibule of

the house, waiting for an ambulance while bleeding and in excruciating pain. As our supreme court stated in *Sutton*, 233 Ill. 2d at 108, "[w]e believe it is inconceivable *** that [the victim] would have spent the time under these conditions to attempt to fabricate a story or statement about the event." (Internal quotation marks omitted.) Thus, the trial court correctly admitted his statement as an excited utterance.

¶ 31    For the first time on appeal, Mayberry also argues that admission of Triplett's statement violated his right to confront his accusers under *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford* held that the confrontation clause of the sixth amendment bars "testimonial" hearsay statements from being admitted against a criminal defendant, unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 53-54.

¶ 32    The State argues that no error occurred because Triplett's statement was not "testimonial." To decide whether a statement is testimonial, we must determine "whether, *** viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " *Ohio v. Clark*, 576 U.S. ___, ___, 135 S. Ct. 2173, 2180 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). Thus, statements not made to law enforcement officers are "much less likely to be testimonial" than statements to law enforcement officers. *Id.* at ___, 135 S. Ct. at 2181; see also *Crawford*, 541 U.S. at 68 (the term "testimonial" applies "at a minimum" to police interrogations, as well as testimony at a preliminary hearing, before a grand jury, or at a prior trial).

¶ 33    Our supreme court has held that a testimonial statement is one that (1) is made in a solemn fashion and (2) is intended to establish a particular fact. *Sutton*, 233 Ill. 2d at 111 (citing *People v. Stechly*, 225 Ill. 2d 246, 281, 282 (2007)).

"A statement is made in a solemn fashion if it is formal (such as under oath or made to a police officer) or if there is some threat of consequences for dishonesty. [Citations.] A statement is intended to establish a particular fact if the declarant is acting in a manner analogous to a witness at trial, giving information about past events that could potentially be relevant to a later criminal prosecution." *People v. Cleary*, 2013 IL App (3d) 110610, ¶ 56 (citing *Stechly*, 225 Ill. 2d at 281-82, and *Sutton*, 233 Ill. 2d at 119-20).

¶ 34    In this case, Triplett's statement to Corhn was not made in a solemn fashion. Corhn was a friend and a fellow victim of the shooting, not a law enforcement official or other authority figure who could impose consequences for dishonesty. Moreover, given the severity of Triplett's wounds, a reasonable person in his position would not have anticipated that what he said to his friend while waiting for medical personnel to arrive would later be used in a prosecution. In sum, under the circumstances, we do not find that the primary purpose of the conversation was to create an out-of-court substitute for trial testimony. See *People v. Lisle*, 376 Ill. App. 3d 67, 81 (2007) (shooting victim's statement to aunt, made 18 minutes after the shooting while waiting for medical personnel to arrive, was not testimonial). Accordingly, admission of Triplett's statement did not violate *Crawford*.

¶ 35                          B. Alternate-Suspect Evidence

¶ 36    Mayberry next argues that the trial court improperly excluded evidence that the gun used in the shooting was also used in an unrelated shooting while Mayberry was in custody on this case.

¶ 37    As noted, the shooting occurred on October 7, 2012. Mayberry was arrested on December 28, 2012; no weapon was recovered at that time. On January 16, 2013, there was a shooting at 99th Street in Chicago, after which police recovered a gun discarded on the side of the road.

Ballistics testing revealed that the discarded gun was the same gun used by the shooter in the present case. Mayberry's fingerprints were not present on the gun.

¶ 38    The State filed a motion *in limine* to prohibit Mayberry from introducing any evidence as to the recovery of the gun. Mayberry argued that the evidence was relevant because it created reasonable doubt as to whether he was in possession of the gun on the date of the shooting. Following arguments by the parties, the trial court granted the State's motion, finding the evidence "too remote and too speculative." The court explained:

> "[T]hese guns are as fluid as anything can be on the street. I could do a murder and hand it off to somebody else five hours later and it be used in another crime. It's a small item. It's something that can go back and forth between people. It's something that can be hidden."

¶ 39    The admissibility of evidence is within the trial court's sound discretion, and we will not reverse the trial court's ruling absent an abuse of discretion. *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000). In general, a defendant may present evidence regarding an alternate suspect if the evidence is relevant, *i.e.*, it makes the existence of a material fact more or less likely than it would be without the evidence. *Id.* However, such evidence is properly excluded if its connection to the crime at issue is overly remote or speculative. *Id.* at 539-40; *People v. Beaman*, 229 Ill. 2d 56, 75 (2008); see also *Wilson v. Firkus*, 457 F. Supp. 2d 865, 886 (N.D. Ill. 2006) (because a defendant has a sixth amendment right to present evidence on his own behalf, it is not constitutionally permissible to alter ordinary relevancy rules when it comes to admission of third-party exculpatory evidence, but it is permissible to exclude evidence "that is unreliable or of marginal relevance to the case at hand").

¶ 40        Here, Mayberry intended to put forth the perpetrator of the January 16, 2013 shooting as an alternate suspect for the shootings in this case, which occurred more than three months earlier. But possession of the gun—a small handheld item that can easily be given to, or taken by, another person—is the only link between these incidents. *Cf. People v. Davis*, 278 Ill. App. 3d 532, 540 (1996) (evidence was insufficient to convict defendant of murder even though defendant was the owner and last known possessor of the gun used in the fatal shooting). Particularly in light of the trial court's cogent explanation for its decision, we do not find that the trial court abused its discretion in excluding this evidence as overly remote and speculative.

¶ 41        In this regard, the present case is analogous to *Kirchner*, 194 Ill. 2d 502, where the defendant was charged with fatally stabbing multiple victims. His friend Warner testified that defendant stole the murder knife from his house on the day of the murders. Defendant sought to introduce evidence that Warner was in possession of the knife several weeks before the murders. *Kirchner* held that exclusion of this evidence was proper because (1) it was "too remote" to establish that Warner possessed the knife at the time of the murders and (2) it did not undermine Warner's claim that defendant stole the knife. *Id.* at 540. Similarly, in this case, the fact that another individual possessed the gun on January 16, 2013 does not undermine the State's claim that Mayberry possessed it three months earlier on October 7, 2012.

¶ 42        Mayberry cites *Firkus*, 457 F. Supp. 2d 865, *Beaman*, 229 Ill. 2d 56, *People v. Wilson*, 149 Ill. App. 3d 293 (1986), and *People v. Nitti*, 312 Ill. 73 (1924), as cases where alternate-suspect evidence was found to be relevant and material to the defense. These cases are distinguishable because they all involved a significantly stronger nexus between the alternate suspect and the crime at issue. In *Firkus*, 457 F. Supp. 2d 865, the nexus was *modus operandi*: defendant was charged with the unprovoked stabbing of a victim at a bus stop. Thus, it was

relevant that a third party, Wagner, committed five unprovoked stabbing attacks in the same two-week period within an approximate one-mile radius, particularly since one of Wagner's attacks was strikingly similar to the crime for which defendant was charged (it occurred in a nearly identical manner at a bus stop six blocks away). *Id.* at 886-87. By contrast, the record does not reflect any similarity in the *modus operandi* of the October 7 and January 16 shootings, or any other commonalities between the crimes.

¶ 43     *Beaman*, 229 Ill. 2d 56, *Wilson*, 149 Ill. App. 3d 293, and *Nitti*, 312 Ill. 73, all involved alternate suspects who had a connection to the victims and were linked to the crimes by circumstances, motivation, or both. In *Beaman*, 229 Ill. 2d at 74, the alternate suspect was the victim's ex-boyfriend. He had a history of domestic abuse and a pending charge for domestic battery, and he refused to cooperate with a polygraph examination; police considered him a "viable suspect" at the time of defendant's trial. *Id.* at 67-68. In *Wilson*, 149 Ill. App. 3d at 296, the alternate suspect had been involved in a violent argument with the victims hours before they were murdered, his fingerprints were found at the scene of the crime, and the day after the bodies were discovered, he was arrested while driving a car belonging to one of the victims. Finally, in *Nitti*, 312 Ill. at 89-90, the alternate suspect was the victim's son who, two weeks before the victim's disappearance, got into a fight with the victim and nearly beat him unconscious.

¶ 44     Again, the record does not reflect that the alleged perpetrator of the January 16 shooting had any such connection to the present case. Accordingly, Mayberry's cases are inapposite, and the trial court acted within its discretion in barring him from introducing alternate-suspect evidence.

¶ 45                                C. Willis's Identification

¶ 46        Mayberry finally argues that his counsel was ineffective for failing to move to suppress

Willis's identification of him. He argues that there was "a very substantial likelihood of

irreparable misidentification" (internal quotation marks omitted) (*People v. Gabriel*, 398 Ill.

App. 3d 332, 348 (2010)) because Willis looked up Mayberry's photo on Facebook prior to

viewing the photo array in which he identified him as the shooter.

¶ 47        To prove ineffective assistance of counsel, a defendant must show that (1) counsel's

performance was objectively unreasonable and (2) defendant was thereby prejudiced. *People v.*

*Patterson*, 2014 IL 115102, ¶ 81 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

For the performance prong, we are mindful that counsel's decision not to file a motion to

suppress is typically " 'a matter of trial strategy, which is entitled to great deference.' " *People v.*

*Bew*, 228 Ill. 2d 122, 128 (2008) (quoting *People v. White*, 221 Ill. 2d 1, 21 (2006)). For the

prejudice prong, Mayberry bears the burden of demonstrating "that the unargued suppression

motion is meritorious, and that a reasonable probability exists that the trial outcome would have

been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 48        Here, we find that no prejudice could have resulted to Mayberry from his counsel's

actions because even without Willis's identification, the evidence against Mayberry was

overwhelming. Minutes after the shooting, Triplett identified the shooter as "Lil Dave" (*i.e.*,

Mayberry), whom he knew from the neighborhood. A couple blocks away, Davis observed

Mayberry walking past her window, wearing clothes that matched the shooter's clothes, before

he took off his hoodie and jumped into a getaway vehicle. Shortly thereafter, police recovered

Mayberry's hoodie and a black skull cap discarded behind a bush, and Mayberry's hoodie tested

positive for gunshot residue on both cuffs and on the inside of the right front pocket.

¶ 49       Finally, Reavers viewed a photo array and signed a photo of Mayberry, whom he knew since he was 12 years old. He also signed a lineup advisory form indicating that the suspect might or might not be in the photo array. Although Reavers denied at trial that Mayberry was the shooter, Stover contradicted Reavers' testimony in this regard, and Reavers admitted fighting with Mayberry a week or two before the shooting.

¶ 50       In light of this evidence, we find no reasonable probability that the outcome of the trial would have been different if Willis's identification had been suppressed. Accordingly, we reject Mayberry's ineffective assistance of counsel claim. See *Patterson*, 2014 IL 115102, ¶ 87 (claims of ineffective assistance of counsel may be decided on *Strickland*'s prejudice prong alone).

¶ 51                                    III. CONCLUSION

¶ 52       For the foregoing reasons, we affirm the judgment of the trial court.

¶ 53       Affirmed.

---

**No. 1-18-1806**

---

| | |
|---|---|
| **Cite as:** | *People v. Mayberry*, 2020 IL App (1st) 181806 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-1952; the Hon. Neil J. Linehan, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Richard Dvorak, of Dvorak Law Offices, LLC, of Willowbrook, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Hareena Meghani-Wakely, and William Bruce, Assistant State's Attorneys, of counsel), for the People. |

---