2023 IL App (1st) 220101-U

SIXTH DIVISION
June 30, 2023

No. 1-22-0101

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 22 CR 0470401 |
| | ) | |
| TERRELL VINING, | ) | The Honorable |
| | ) | Vincent Gaughan, |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Mikva and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    Held:The judgment of the circuit court is affirmed. The circuit court did not abuse its discretion when it denied the State's motion *in limine* seeking to admit a witness-decedent's statements under the excited utterance exception to the hearsay rule.

¶ 2                                I. BACKGROUND

¶ 3    The State charged Terrell Vining with first degree murder for the January 15, 2020, shooting and death of Sasha Moore. Carl Jackson, Moore's boyfriend, witnessed the shooting and

made statements to the responding police officers. Jackson was the only witness to Moore's shooting. Before the State could try Vining, however, Jackson was killed in an unrelated shooting.

¶ 4                                    A. Motion *in Limine* Hearing

¶ 5      On October 28, 2021, the State filed a motion *in limine* to admit as evidence statements Jackson made to police officers on the scene under the excited utterance exception to the rule against hearsay. The motion presented the following background.

¶ 6      Moore advertised cannabis for sale on Facebook under her own Facebook profile. Vining, under the Facebook profile "Chris Paul," contacted Moore to purchase cannabis, and they set up a location to meet. Moore and Jackson then drove Moore's Chevrolet Malibu to the Falcon Fuel gas station at 8255 South Halsted Avenue in Chicago. Jackson rode in the passenger seat.

¶ 7      While there is a discrepancy about the time due to the accuracy of the time stamp of Falcon Fuel's video surveillance footage, the motion describes what is shown on the video. The motion states that at approximately 12:25 a.m., a black four-door vehicle resembling Moore's Chevrolet Malibu pulled into the gas station, parked, and stood stationary for a few minutes. At the same time, the video captures Vining in a black, puffy fur-trimmed winter coat. The video then shows the vehicle resembling Moore's Malibu pulling out of the gas station and driving south on Halsted Street and then west onto 83rd Street. The video then depicts Vining crossing Halsted Street and heading west on 83rd Street. Although the State's motion describes what is on the Falcon Fuel video surveillance footage, the State did not offer the video itself as evidence at the hearing on the motion *in limine*.

¶ 8      The motion further states that around 12:35 a.m., police officers responded to a "ShotSpotter" report at 8259 South Peoria Street. Around the same time, Jackson flagged down a police vehicle on 83rd Street. Moore was lying on the ground next to the driver's side door of her

Malibu with a gunshot wound to her head and back. Officers observed Jackson on the ground sitting near the vehicle. Jackson was upset, crying, and screaming. A body worn camera (BWC) captured part of the encounter with Jackson. The BWC footage shows that Jackson was on the phone as officers approached him. The officers heard Jackson talking to his mother and stating this was his fault, he should have stayed home, and Moore was shot over "some weed." Officers then asked Jackson to tell them who shot Moore:

"JACKSON: Oh my fuckin' God bro. He just shot her in the head over some fuckin' weed bro. Over some fuckin' weed.

OFFICER # 4: Who, who shot her?

OFFICER # 1: Who did?

JACKSON: I don't fucking know dude bro. If I knew him I'd fucking tell you every fuckin' thing.

OFFICER #1: Okay.

JACKSON: His name is Chris Paul on fuckin' Facebook bro.

OFFICER # 1: Chris Paul, Okay.

JACKSON: He wear glasses on his head bro."

In a subsequent exchange, the officers prompted Jackson for any additional information:

"OFFICER # 4: How tall is he?

JACKSON: Bro I don't (inaudible) I knew he was gonna do that bro.

JACKSON: Could I get my ID for I can go with her.

OFFICER # 4: Hold up man.

\*\*\*

OFFICER # 4: You said dude's name is Chris Paul on Facebook.

JACKSON: Yeah.

OFFICER # 4: How, how old is he about?

JACKSON: I don't know him at all. I don't know him.

OFFICER # 4: You said he wears glasses, just give me all of his information man.

OFFICER # 5: Listen any rough estimate, anything that can help.

JACKSON: (inaudible).

JACKSON: 83, I mean 840 South Peoria. That's the address he gave her to meet her at. I knew what it was cause when we were coming out the gas station Bro he really was talking to some dude in a green jacket and they kept looking. I was telling her to fucking move.

*\*\**

"OFFICER #5: Stop.

JACKSON: What you talking about man. I don't know—twenty something.

OFFICER #5: There that's all we need.

JACKSON: … his height, wore glasses.

OFFICER #5 There you go.

JACKSON: …black shoes…fuckin tan, fucking fur on it.

OFFICER #5: Keep going.

JACKSON: He got glasses, got little ass dreads in his hair. That's all I fuckin' know."

¶ 9    Vining objected to the State's motion and exhibits on several bases. First, Jackson did not appear to have personal contact with the person who went by "Chris Paul" on Facebook and Jackson did not have any independent knowledge of "Chris Paul." Second, the transcript of the BWC footage attached to the motion was inaccurate because there were discrepancies between when the video starts and when the transcript begins. Third, it is unclear from the motion which of

Jackson's statements the State was seeking to admit as excited utterances. Fourth, the State did not identify the police officers on the scene who spoke to or questioned Jackson. Fifth, the motion and exhibits were vague and conflicting, and the State had an obligation to ensure the accuracy of the proffered exhibits. Sixth, the statements could not qualify as excited utterances because Jackson made them in response to police questioning and Jackson was under duress because the police officers would not allow Jackson to leave until he answered their questions. Seventh, any statement about "Chris Paul" was hearsay within hearsay because Jackson had no personal knowledge of him and relied on information from Moore about "Chris Paul."

¶ 10    At the hearing, the State called Chicago Police Officer Victor Nieves. Officer Nieves testified that he was on duty on January 15, 2020, and that at approximately 12:30 a.m. he and his partner were dispatched to 8259 South Peoria Street. Officer Nieves had a BWC, which he turned on at 12:42 a.m. when he arrived on the scene. Nieves's BWC recorded without audio for about a minute. We note that it appears from the video from Officer Nieves's BWC that Jackson's conversation with his mother occurs while Officer Nieves's BWC is not recording any audio. The transcription of the conversation with his mother appears to be from another officer's BWC.

¶ 11    Officer Nieves characterized Jackson's demeanor as hysterical when he approached him. Jackson walked away, screamed, and attempted to check on Moore. Officer Nieves was present while other police officers questioned Jackson. According to Officer Nieves, Jackson volunteered at least some information without anyone asking him questions.

¶ 12    After the State laid the foundation, the State published Officer Nieves's BWC footage. The State then rested. The trial court then inquired about Jackson providing the incorrect address of the gas station when he said it was located at 840 South Peoria. The State proffered that there was a

"green gas station" two blocks away from the shooting and there was a video from the gas station that the State intended to introduce into evidence later.

¶ 13    In denying the State's motion *in limine*, the trial court found several flaws in the State's evidence. First, it found it "unusual" that the State only called Officer Nieves to testify when he was neither the first officer to arrive at the scene nor the officer who questioned Jackson. Second, the court questioned why the State did not introduce the BWC footage from the other responding officers. Third, the court noted that Jackson was speaking to his mother at the time Officer Nieves arrived on the scene.

¶ 14    The trial court concluded that there was "absolutely" a startling event that would cause an excited utterance but nevertheless found that there was not an absence of time to fabricate the statement and denied the State's motion *in limine.* First, the court noted that Jackson was not emotionally in control of himself, and that officers restrained him when he attempted to walk away. Second, the court noted that Jackson was speaking to his mother before he made the statements at issue. Third, the court questioned Jackson's reliability because he incorrectly identified the address of the gas station and because of his lack of control over his emotions. Fourth, the court stated that there was no evidence of what occurred in the minutes before Office Nieves arrived on the scene and turned on his BWC.

¶ 15                    B. Motion to Reconsider Hearing

¶ 16    In what can only be considered an attempt to take a second bite at the apple, the State filed a motion to reconsider, in which it sought to address the trial court's factual findings and present additional evidence, including proffering what Sergeant Cobb and Officer Lupo, who were present on the scene, would testify to. Prior to summarizing the testimony the State proffered, we note for clarity that the motion to reconsider sought to introduce *new* evidence *and* to have the trial court

reconsider its previous ruling with the benefit of the newly offered evidence. The motion does not address the legal standard or cite any case law but merely attempts to challenge the trial court's conclusion that there was not an absence of time to fabricate.

¶ 17    In its motion to reconsider, the State proffered that Sergeant Cobb would testify that Jackson flagged him down at approximately 12:35 a.m. and informed him that someone shot Moore. Cobb would testify that he observed Jackson was hysterical and on the phone when he ran out into the street, and that Jackson described the offender as a black male wearing a black jacket with fur. He would testify that Jackson reported the shooting to 911 around 12:36 a.m.

¶ 18    The State also sought to publish a radio dispatch, the transcript of which was not attached to the motion to reconsider, made by Sergeant Cobb seeking assistance at the scene. Sergeant Cobb remained on the scene as other officers, including Officer Nieves, arrived. Prior to Officer Nieves's arrival, Officer Dominic Lupo arrived and was wearing a BWC, which he activated about two minutes before Officer Nieves activated his BWC. The State sought to publish Officer Lupo's BWC video footage to show that Jackson was crying and screaming in the background minutes prior to when Officer Nieves arrived and that no officer was interacting or interviewing him at the time.

¶ 19    At the hearing on the motion to reconsider, the State indicated that the testimony of these two additional officers would illustrate the timeline of events and show that there was no time for Jackson to fabricate. The State proffered that Sergeant Cobb would testify that he did not immediately turn on his BWC because he was concerned with his and Jackson's safety and because he did not realize it was turned off.  The State additionally proffered that Officer Lupo would testify that he arrived at 12:38 a.m., no red crime scene tape was placed yet, and that other officers put up crime scene tape after he blocked vehicular traffic from encroaching on the scene.

¶ 20    Vining raised several objections to the State's motion to reconsider. He argued that the evidence does not support that Sergeant Cobb was the first officer on the scene because he did not turn on his BWC until 12:44 a.m., and no police reports were prepared by him or other officers explaining his actions between the time he arrived and the time he turned on his BWC. Additionally, Officer Lupo's BWC video footage shows other officers, who were not identified and whose BWC video footage was not offered into evidence, on the scene when he arrived, including an officer standing by Jackson. While the State contends that no officers spoke to Jackson until Officer Lupo arrived, there is no evidence to support that conclusion. Finally, Vining argued his due process rights were violated because he believed the State did not provide the exact statements it sought to admit or the evidence that supported its motion.

¶ 21    The trial court denied the State's motion to reconsider. Reaching the merits of the State's latest proffer, the court reasoned that because Sergeant Cobb failed to turn on his BWC in violation of the general order requiring him to do so, a critical point in time is missing from Jackson's interactions with Sergeant Cobb. Sergeant Cobb arrived around 12:35 a.m. and Officer's Nieves did not start recording until he arrived at 12:42 a.m., leaving a seven-minute period of time in which there is no video footage. The court reasoned that this lack of video footage undermined the spontaneity of Jackson's statements captured by Officer Nieves's BWC. The court also took issue with Officer Nieves testifying rather than a more experienced officer at the motion *in limine* hearing. The trial court additionally noted that officers partially restrained Jackson during the interactions that produced the statements the State sought to admit, and that Jackson's hysteria undermined his reliability.

¶ 22    The trial court again concluded that Moore's shooting death would qualify as a shocking event that could produce an excited utterance, but that, under the circumstances, Jackson had time

to fabricate because of the period of time between Sergeant Cobb's arrival and Officer Nieves's arrival. Additionally, the trial court found Jackson's conversation with his mother was an intervening factor. Finally, the trial court concluded that "even if [the statement] *** fulfill[ed] all the criteria of the excited utterance, it's undermined by Mr. Carl Jackson's action at that time, and how it was recorded, [and] that he was not reliable."

¶ 23    The State timely filed a notice of appeal pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. Jan. 1, 2023). "Rule 604 (a)(1) allows an interlocutory appeal by the State of a pretrial suppression order whenever the prosecutor certifies to the trial court that the suppression substantially impairs the State's ability to prosecute the case." *People v. Young*, 82 Ill. 2d 234, 247 (1980). The State has so certified here.  "For the purposes of *** Rule 604(a)(1), there is no substantive distinction between evidence that is 'excluded' and evidence that is 'suppressed.' " *People v. Drum*, 194 Ill. 2d 485, 491 (2000).

¶ 24                                    II. ANALYSIS

¶ 25                              A. Applicable Standard

¶ 26    We review evidentiary rulings on hearsay testimony and any exceptions to hearsay under an abuse of discretion standard. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). We find an abuse of discretion only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.* Although the State urges *de novo* review of the trial court's denial of its motion *in limine*, we do so only when the "trial court's exercise of discretion has been frustrated by an erroneous rule of law." *Id.*  The State argues that the trial court's decision was "frustrated by an erroneous rule of law—application of the time-to-fabricate factor[,]" but it provides no support for its contention. Examining the record, we find that the trial court's ruling was not frustrated by an erroneous rule of law. The trial court examined the

"absence of time to fabricate" element and made a factual finding that Jackson had time to fabricate. Therefore, we review the trial court's ruling for an abuse of discretion.

¶ 27    Hearsay is a "statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is not admissible unless an exception exists. Ill. R. Evid. 802 (eff. Jan. 1, 2011). An excited utterance is an exception to hearsay and related to a startling event or condition made while the declarant was under the stress or excitement caused by the event. Ill. R. Evid. 803 (eff. Jan. 25, 2023). Excited utterances have an enhanced reliability "because when people are under physical or mental shock, the stress of the situation typically causes them to express genuine belief as to the facts they have just observed." *People v. Mayberry*, 2020 IL App (1st) 181806, ¶ 27. To qualify as an excited utterance, "there must be (1) an event sufficiently startling to produce a spontaneous and unreflecting statement, (2) an absence of time to fabricate, and (3) a relation between the statement and the circumstances of the event." *Id.* In determining whether a statement qualifies as an excited utterance, we employ a totality of circumstances analysis, considering time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest. *People v. Sutton*, 233 Ill. 2d 89, 107 (2009).

¶ 28    The parties do not dispute that Moore's shooting death qualifies as a sufficiently startling event. The dispute and the trial court's ruling primarily focused on whether there was an absence of time to fabricate and on the spontaneity of Jackson's statements. There is no bright-line test to determine the time to fabricate factor but the critical inquiry is "whether the statement was made while the excitement of the event predominated." *Id.* The determinative inquiry related to spontaneity is whether the declarant would have made the statements if the questions had not been asked. *People v. Georgakapoulos*, 303 Ill. App. 3d 1001, 1014 (1st Dist. 1999).

¶ 29                              B. Jackson's Statements

¶ 30    As a threshold matter, the parties dispute whether the evidence proffered by the State in its motion to reconsider may be considered on appeal. "The purpose of a motion to reconsider is to bring to the court's attention changes in the law, errors in the court's previous application of existing law, and newly discovered evidence that was not available at the time of the hearing.*" People v. Bravo*, 2015 IL App (1st) 130145, ¶ 23 (Internal quotations omitted). Vining contends that the motion is really a motion to reopen evidence, and the State argues that the motion sought to address "the court's previous misapplication and misapprehension of the law[.]" The motion to reconsider plainly sought to introduce evidence that was available to the State at the time the motion *in limine* was filed and argued. The State specifically acknowledged that the reason it sought "to present this new evidence *** [is] not so that it would be admitted for purposes of excited utterances but solely for the purpose to address *** the Court's concern concerning the second factor of absence of time to fabricate." We find that the sole purpose of the motion to reconsider was to introduce new—but previously available—evidence, and to re-argue the absence of time to fabricate factor. Thus, the motion to reconsider was improper and allowing the evidence would amount to an impermissible do-over on the motion *in limine.* Moreover, as we explain further below, even if we were to consider the State's newly proffered evidence in its motion to reconsider, we would reach the same result.

¶ 31    We begin first with the evidence offered by the State in connection with its original motion *in limine*: the transcript of the BWC video attached to the motion *in limine*, Officer Nieves's testimony, and Officer Nieves's BWC camera footage, all of which the trial court admitted into evidence. We have reviewed the footage from Officer Nieves's BWC as well, and while we note that the transcript attached to the motion *in limine* appears to be a compilation of audio from other

BWC footage, the transcribed statements the State sought to admit are identical or substantially similar to those heard on the footage of Officer Nieves's BWC.

¶ 32    On appeal, the parties dispute whether Jackson's statements were spontaneous and unreflecting. Our supreme court has recognized that persistent questioning will destroy the spontaneity of a statement. See *People v. Zwart*, 151 Ill. 2d 37, 48 (1992) (holding that declarant's statements were not excited utterances because the declarant was interviewed by three people at least three times before she made her first statement regarding the abuse.). Vining argues that Jackson's statements were not spontaneous and unreflecting because Jackson made them under the coercion of police officers and in response to questions asked by police officers. He notes that Jackson kept leaving or attempting to leave and did not want to answer any of the police officers' questions. Vining points to the BWC footage, which shows police officers positioning Jackson near a fence, restraining him with their hands, and pulling him back as he left. Vining also argues that the statements made by Jackson were not spontaneous because police officers asked more than one or two questions and Jackson continued to move away from the officers. Cf. *Georgakapoulos*, 303 Ill. App. 3d at 1014-15 ("[Declarant]'s statements to Ray and Chavez were spontaneous even though [they were] made in response to questions directed at him. [Declarant]'s statement to Chavez occurred in response to the single question 'what happened,' " and "to Ray's questions, what happened, who shot you, and 'Who? What Sammy?' ***."). Vining asserts that given the police officers' questions and the restriction of Jackson's movement, Jackson's statements cannot be a "spontaneous and sincere response" to Moore's shooting because Jackson's description of the shooter was neither willingly nor spontaneously volunteered, and to find a statement made under these circumstances an excited utterance would greatly expand the exception.

¶ 33    The State responds that Jackson's statements were spontaneous because he had just witnessed Moore's shooting death and his behavior and disjointed statements are consistent with the circumstances. The State disputes Vining's characterization that the police officers "interrogated" Jackson, pointing out that Jackson walked away from the police officers so he could check on Moore. The State also argues that *Georgakapoulos* supports its position, because it holds that the spontaneity of a declarant's statement was not destroyed even though multiple individuals asked him more than two questions.

¶ 34    Like the declarant in *Georgakapoulos,* Jackson made statements in response to multiple questions. However, this case is distinguishable from *Georgakapoulos* because the declarant there made statements as he was lying on the ground, moments after someone shot him, when he was seriously wounded and under the shock of the event. *Georgakapoulos,* 303 Ill. App. 3d at 1015. Jackson, however, was not physically injured in Moore's shooting death. Although it is clear from the video that the shooting affected Jackson's emotional state—he can be seen screaming and pacing around at the crime scene—and his reaction was an expected one given his proximity to Moore's body and the amount of blood that is seen, Jackson was not under the stress of just having been shot like the declarant in *Georgakapoulos*. *Georgakapoulos* is also distinguishable because, there, the court found that the declarant would have made the statements identifying the shooter even if he had not been prompted to do so because he had already volunteered that information to another individual. *Id.* Here, by contrast, although Jackson told his mother on the phone that Moore was shot over "some weed," there is no evidence that he previously volunteered the subject identification statements to anyone else at the scene before making the statements in response to questions put to him by the police officers.

¶ 35    We turn now to Jackson's conversation with his mother prior to making the statements at issue, and whether this intervening event provided him with sufficient time to reflect. According to the transcript attached to the motion *in limine,* Jackson told his mother: "No, no, no. No, I don't got time to be hearing that mom. Mom I do not wanna fucking hear that. I don't wanna hear that." Additionally, Jackson acknowledged that he "should have stayed in the house." While Officer Nieves's BWC footage does not capture the conversation, it does confirm that Jackson was on the phone when Officer Nieves arrived. In the video footage from Nieves's BWC, Jackson can be seen holding his phone next to his mouth and away from his ear and, at times, it appears he is speaking into the phone as officers question him.

¶ 36    Vining relies on four cases to support his contention that Jackson's intervening phone call to his mother provided him with sufficient time to reflect, undermining the spontaneity of his statements. In *People v. Victors*, the declarant spoke to two police officers, and made the subject statements to the second officer five minutes after speaking to the first officer. *People v. Victors*, 353 Ill. App. 3d 801, 810 (2nd Dist. 2004). The *Victors* court found the statements to the second officer were not excited utterances because the record did not reflect what questions were asked by the first officer and the declarant had the opportunity to reflect before she spoke to the second officer. *Id.* In *People v. Sommerville*, the court found that statements to a police officer were not excited utterances because the declarant first had a lengthy conversation with her fiancé. *People v. Sommerville*, 193 Ill. App. 3d 161, 175 (2nd Dist. 1990). In *People v. Robinson,* the declarant made the subject statement to a police officer 3.5 hours after the startling event and after he had spoken about the crime with her sister and brother-in-law. *People v. Robinson*, 73 Ill. 2d 192, 199 (1978). The *Robinson* court reasoned that under these circumstances, to conclude that the "statements were spontaneous *** would do utter violence to the rule." *Id.* In *People v. Jones*, the court found that

14

the excited utterance exception did not apply because eight hours had lapsed between the crime and the statements, and the declarant had spoken to two deputies before making the statement. *People v. Jones*, 106 Ill. 2d 342, 354 (1985).

¶ 37　In response, the State argues that Vining advocates for a *per se* rule that if a declarant first speaks to another person, any statement that follows cannot qualify as an excited utterance, and that our supreme court already rejected such a rule in *People v. House*, 141 Ill. 2d. 323 (1990). In that regard, the State contends that *Victors* and *Sommerville* conflict with *House*. We do not agree. While we acknowledge that there is no *per se* rule, the *House* court found "[t]he fact that the declarant may have previously spoken to another is *** a factor to consider in determining admissibility." *Id*. at 386. Therefore, speaking with another person prior to making a statement, although not dispositive, is a factor that may be considered when determining whether the statement qualifies as an excited utterance.

¶ 38　The State does not address *Robinson* or *Jones,* but instead relies on two cases where conversations with others did not prevent subsequently made statements from qualifying as excited utterances. In *People v. Perkins*, this court found that a declarant's statement was an excited utterance even though the declarant had spoken to her son, mother, and brother before making the statements to the officers. *People v. Perkins*, 2018 IL App (1st) 133981, ¶¶ 69-71. In that case, the declarant had sustained a gunshot wound and the court reasoned that it was unlikely she fabricated details of the crime while in pain and receiving medical treatment. *Id*. at ¶ 72. The State also relies on *Sutton*, where the court found that a declarant's statements to an officer while being transported to a hospital after a gunshot wound qualified as an excited utterance even though the declarant had previously spoken to other officers. *Sutton*, 233 Ill. 2d at 109. Again, the court reasoned that

15

because the declarant had sustained injuries, he would not have spent the time between the crime and his utterances fabricating a statement about the event. *Id.*

¶ 39 While the caselaw is clear that speaking to another person before making a critical statement does not preclude the statement from qualifying as an excited utterance, it is a compelling factor that weighs against finding that the statement constitutes an excited utterance in this case. Jackson spoke to his mother prior to making the statements at issue and while we do not have evidence of their entire conversation, we do know that Jackson said he did not want to hear what his mother was saying, knew that he should have stayed home, and Moore was shot over "some weed." Unlike the circumstances present in other cases where the declarant's injury was a compelling factor that supported a declarant's lack of time to reflect despite an intervening conversation with another, there is no indication here that Jackson was physically injured or that he received any treatment. We cannot say, under these circumstances, that the trial court's conclusion–that Jackson's intervening conversation with his mother weighed against a finding that his later statements to the police officers were excited utterances–was an abuse of discretion.

¶ 40 The State and Vining also disagree about the significance of Jackson's understandable concern for Moore, and whether this weighs in favor of or against a finding of an excited utterance here. Nieves's BWC footage shows Jackson expressing his frustration that officers were not assisting Moore, stating, "she got shot point blank in the fucking face and ya'll moving like she got shot in the fucking leg." Additionally, at the outset, the footage shows Jackson asking to see Moore at the hospital but stating he does not need to be examined at the hospital. However, after police officers told him he could not go to the hospital, Jackson asks to go to the hospital again, this time stating that he wants to be examined because he does not "feel good" and feels hurt. The State contends that Jackson's concern for Moore shows that he was still affected by the excitement

16

of the shooting, thus weighing in favor of finding an excited utterance here. Vining, by contrast, argues that Jackson's words and behavior tend to show self-interest in that he had time to fabricate pretext about needing a medical examination so he could see Moore after the officers refused his request, weighing against a finding of an excited utterance.

¶ 41    Vining relies on *People v. Lawler*, in which the declarant was abducted and persuaded her abductor to allow her to make a phone call. *People v. Lawler*, 142 Ill. 2d 548, 552-53 (1991). The declarant called her father and, through a false story and a series of answers to yes or no questions, relayed to her father that she had been abducted and needed assistance. *Id.* Our supreme court found that while the abduction qualified as a sufficiently startling event, the conversation showed that the declarant had time to reflect on the abduction and to conceive and execute the fabrication. *Id.* at 560. Thus, the statements made to the father were inadmissible as excited utterances. *Id.* The State contends *Lawler* is inapplicable because the declarant there admitted to the fabrication and here, "Jackson never stated he had fabricated his statements identifying the shooter, and his statements were not in response to leading questions."

¶ 42    *Lawler* is an example of a fabrication that the declarant freely admitted, which is not present in this case. However, the record does indicate that Jackson *may* have been motivated to fabricate a pretext to ride in the ambulance with Moore to the hospital or to later be transported to the hospital to be with her. We count at least four instances where Jackson asks to go with Moore but officers told him that he cannot because they needed more information. In one instance, Jackson specifically states: "I want to check on her bro, I don't care about me bro." After officers continue to ask questions, Jackson again indicates he wants to go to the hospital. Concurrently, officers ask Jackson to show them which gas station he is referring to by taking a ride. Jackson then states that he needs to get "checked out" and asks if he can go to the same hospital as Moore. The statements

the State sought to admit as excited utterances, including the statement confirming the Facebook identity and physical description of the shooter and his clothes, were made between the first time officers told Jackson that he could not go with Moore to the hospital to the time Jackson indicates he is not feeling well. In other words, at the very same time Jackson made the statement the State sought to admit as an excited utterance he had expressed a continued desire to leave the scene and go to the hospital on the pretext that he needed medical assistance. We note that this is only one part of the totality of circumstances that supports the trial court's ultimate ruling to deny the motion *in limine.*

¶ 43    Next, the State takes issue with the trial court's finding that Jackson was less reliable because of his emotional state. It argues that courts have found that excited utterances have enhanced reliability, not less, in part because of the declarant's reaction to the startling event. In response, Vining argues that the State's assertion assumes reliability of the statement prior to an actual finding that the declarant made an excited utterance, and that the State improperly urges a presumption of reliability when a declarant is an emotional state. Hearsay is generally unreliable unless an exception, like an excited utterance, applies. *See People v. Tenney*, 205 Ill. 2d 411, 432-433 (2002). As we have discussed previously, to determine whether the excited utterance exception applies, we consider the totality of the circumstances. Here, the trial court's discussion of reliability and Jackson's mental state was primarily made during the court's evaluation of whether his statements qualified as excited utterances. The trial court's comments about Jackson's lack of reliability due to his "hysteria" are but one part of its totality of circumstances analysis, and we find no abuse of discretion here. While the declarant's mental condition is a well-established factor to consider when evaluating whether a statement is an excited utterance, our caselaw does not indicate that simply because a person is emotional—in this case hysterical—their statement is

presumed to be an excited utterance. After all, the mental condition of the declarant is only one part of the analysis and not a dispositive factor in and of itself.

¶ 44    The State next contends that the trial court expressed concerns during the hearings on the motion *in limine* and the motion to reconsider that were not relevant in determining whether Jackson's statements qualified as excited utterances. These concerns included the fact that Officer Nieves testified as opposed to another more experienced officer who had questioned Jackson; that Sergeant Cobb did not turn on his BWC immediately after encountering Jackson, which potentially violated a Chicago Police Department general order; and that Jackson did not correctly identify the address of the gas station. In response, Vining contends that the court was, in part, concerned that there was no evidence of what occurred prior to the arrival of Officer Nieves, including from BWC video footage from the officers who questioned or otherwise spoke to Jackson. Moreover, Vining argues that the court's issue with proffered evidence concerning Sergeant Cobb, which was first offered on the State's motion to reconsider, was based, in part, on questions about the completeness and sufficiency of the evidence. We find that these remarks relate in large part to the inquiry into whether there was an absence of time to fabricate and are only one part of the totality of circumstances the court considered. We cannot say—nor has the State shown—that any of these remarks ultimately amount to an erroneous application of the law when all the other facts are considered under the totality of the circumstances.

¶ 45    We note that the State's newly proffered evidence related to Sergeant Cobb and Officer Lupo does little to support its position. In fact, the testimony lends support to a finding that critical periods of time prior to the start of Officer Nieves's BWC video footage are unaccounted for, which in turn supports both a finding of lack of spontaneity and a lack of absence of time to fabricate. In other words, if we were to fully consider the proffered evidence not only does the

proffered testimony support Vining's arguments but also supports the trial court's denial of the motion *in limine*.

¶ 46 Considering the totality of the circumstances, we cannot say that the trial court abused its discretion when it denied the State's motion *in limine*. Because we have concluded that the trial court did not abuse its discretion, we need not address Vining's alternative argument that Jackson's statements would be barred under the confrontation clause of the sixth amendment.

¶ 47                                    III. CONCLUSION

¶ 48 For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 49 Affirmed.